[No. 29715. Department Two. July 18, 1946.]

THE STATE OF WASHINGTON, *on the Relation of Thor C. Tollefson, as Prosecuting Attorney for Pierce County, Respondent*, v. PAT E. MITCHELL *et al., Appellants.*[1]

*Stuart H. Elliott,* for appellants.

*Thor C. Tollefson* and *Mitchell Doumit,* for respondent.

ROBINSON, J.—This action was brought to enjoin the maintenance of a hog feeding ranch, on the ground that it constituted a public nuisance. The complaint charged:

[1]Reported in 171 P. (2d) 245.

"That on or about June, 1944, the defendants established on said premises, and still maintain thereon, a piggery wherein they raise large numbers of pigs; that in the course of said trade the defendants fed said pigs huge amounts of garbage and refuse which is unlawfully collected and scattered upon the premises; that said garbage and refuse, together with the offal and filth of the pigs, creates obnoxious exhalations and offense [offensive] smells which are offensive and dangerous to the health of the public, that said garbage, refuse, offal, and filth annoys, injures, and endangers the comfort, repose, health and safety of others who live in the vicinity thereof."

The defendants admitted that they were conducting a hog feeding ranch upon the premises in question, but denied that the business was conducted in such a manner as to constitute a nuisance, or that offensive odors spread from their property to the property of other residents of the neighborhood; and further alleged, by way of an affirmative defense, that, if it was found that the business conducted by them did cause offensive odors to be carried over and upon property of other residents of the neighborhood, the condition was one that could be remedied, and that they should be given an opportunity to remedy it before an injunction should issue prohibiting them from maintaining a piggery at that location. They further alleged that the district was a farming district, and that some of the residents were engaged in the dairy business, others, in raising livestock, poultry, fowls, and so forth.

The evidence disclosed that defendants leased a seven and one-half acre tract of land and purchased an adjoining ten-acre tract of land adjacent to McChord Field and Fort Lewis, five miles from the city limits of the city of Tacoma. On this seventeen acre tract of land, defendants commenced the business of fattening pigs for market. The average number of pigs maintained by them was two hundred. They were fed kitchen garbage, called "edible garbage," which they procured under contract from nearby Fort Lewis and McChord Field, and from the United States naval station at Tacoma.

The evidence indicates that all of the equipment used by defendants was modern. The floors of the feeding pens and the feeding troughs were constructed of concrete. Septic tanks were installed, and the feeding pens were apparently washed out regularly after each feeding. There was no evidence that the piggery attracted any vermin or contaminated any water supply. The tract was a heavily wooded one and, apparently, suitable for the purpose of a piggery. The evidence indicates that the neighborhood was both a farming and residential district. Most of the residents owned small five and ten acre farms, although it appears that there was a large dairy, also a large turkey farm, and somewhere, a slaughterhouse in the district. Some of the residents are professional people who prefer to live in the country.

Witnesses for the plaintiff, who resided in the district, testified that, during the summer and early fall of 1944, particularly during warm weather, noxious and offensive odors permeated the air, and that these odors came from defendants' piggery. Other witnesses, called by defendants and who resided no farther from the piggery than did the witnesses for the plaintiff, testified that they at no time noticed any offensive odors, or odors of any kind. A few witnesses testified that, during a period of warm weather in February, 1945, they noticed offensive odors which came from defendants' piggery.

Our statute, under the heading "Crimes Against Public Health and Safety," reads, in part, as follows:

"Every act unlawfully done and every omission to perform a duty, which act or omission (1) Shall annoy, injure or endanger the safety, health, comfort, or repose of any considerable number of persons; . . . Shall be a public nuisance." Laws of 1909, p. 966, § 248; Rem. Rev. Stat., § 2500 [P.P.C. § 118-43].

In a criminal proceeding, brought under a statute similarly worded (*People v. Rubenfeld*, 254 N. Y. 245, 172 N. E. 485), we find an opinion by Judge Cardozo which epitomizes the history and development of the law of public nuisance. We quote from this opinion as follows:

"By the Penal Law of the State, an act which 'annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons' is declared to be 'a public nuisance,' and punishable as a crime (Penal Law, § 1530, subd. 1). The definition corresponds to the distinction between public and private nuisances as it stood at common law (*People v. Kings County Iron Foundry,* 209 N. Y. 207, 210). To be reckoned as 'considerable,' the number of persons affected need not be shown to be 'very great' (*People v. Kings County Iron Foundry, supra*). Enough that so many are touched by the offense and in ways so indiscriminate and general that the mulitipled annoyance may not unreasonably be classified as a wrong to the community. Public is the nuisance whereby 'a public right or privilege common to every person in the community is interrupted or interfered with,' as by the obstruction of a public way (*Wesson v. Washburn Iron Co.,* 13 Allen 95, 102). Public also is the nuisance committed 'in such place and in such manner that the aggregation of private injuries becomes so great and extensive as to constitute a public annoyance and inconvenience, and a wrong against the community, which may be properly the subject of a public prosecution' (*Wesson v. Washburn Iron Co., supra;* cf. Wood on Nuisances [2d ed.], § 71, and cases cited).

"Long ago it was adjudged that one dwelling in a city who with the aid of a speaking trumpet made great noises in the night time to the disturbance of the neighborhood, must answer to the King (*Rex v. Smith,* [1726] 2 Strange, 704). The precedent is not one to be hastily renounced in days when trumpets have a power unknown to a simpler age. Public also was the nuisance where works were so conducted that the air became impregnated with 'noisome stinks and smells' (*Rex v. White,* [1757] 1 Burrows, 333).

"We have gone back to early days, but not for dearth of modern instances.

"A piggery so maintained that 'the occupation of the neighboring houses and passage over the adjacent highways' became 'disagreeable, or worse' was stigmatized by HOLMES, J., as an indictable offense with copious references to precedents of early times and modern (*Commonwealth v. Perry,* 139 Mass. 198).

"SHAW, Ch. J., thought the like of a fat rendering factory defiling the surrounding air. (*Commonwealth v. Brown,* 13 Metc. 365.)

"The ruling was the same, and pronounced by the same court, when the annoyance was a public outcry (*Commonwealth v. Smith*, 6 Cush. 80; *Commonwealth v. Oaks*, 113 Mass. 8, 9).

"The organs of smell and hearing, assailed by sounds and odors too pungent to be borne, have been ever favored of the law (cf. *Bohan v. Port Jervis Gaslight Co.*, 122 N. Y. 18; *McCarty v. Natural Carbonic Gas Co.*, 189 N. Y. 40), more conspicuously, it seems, than sight, which perhaps is more inured to what is ugly or disfigured (*Woodstock Burying Ground Assn. v. Hager*, 68 Vt. 488). Even so, the test for all the senses, for sight as well as smell and hearing, has been the effect of the offensive practice upon the reasonable man or woman of average sensibilities (*Baltimore & Potomac R. R. Co. v. Fifth Baptist Church*, 108 U. S. 317). One of the unsettled questions of the law is the extent to which the concept of nuisance may be enlarged by legislation so as to give protection to sensibilities that are merely cultural or aesthetic."

The trial court found that the maintenance of the piggery created offensive odors which spread throughout the neighborhood, and that the establishment constituted a public nuisance. It further found that it was impossible to conduct it without creating offensive odors and enjoined the operation thereof in any manner.

We are not inclined to disturb the finding of the trial court that the piggery, as operated by the defendants prior to the time of the trial, constituted a public nuisance. However, we cannot agree that the finding of the trial court that the evidence shows that it cannot be conducted without creating a nuisance, or with its conclusion that the defendants should be denied an opportunity to try out some plan for the prevention of the noxious odors and their escape to the property of other residents of the neighborhood.

Some of the witnesses for the plaintiff testified that a great deal of garbage was strewn over the ground, and that this was the source of the offensive odors. Defendants admitted that some of the garbage was not consumed by the pigs and was spread over the ground as fertilizer, and later plowed under the soil. If it was this garbage that caused

the offensive odors, it would seem that the nuisance could readily be obviated.

In *Grant v. Rosenburg,* 112 Wash. 361, 192 Pac. 889, 196 Pac. 626, the nuisance complained of was a slaughterhouse which was alleged to emit intense noxious odors, polluting the air for a distance of a half mile or more. The trial court restrained the operation of the plant at that location, or anywhere in that vicinity. On appeal, the trial court's disposition of the cause was approved in a Departmental decision, one of the judges, however, dissenting as follows:

"In my opinion, the decree should merely be modified so as to require the appellants to abate the nuisance by installing such apparatus and appliances as will destroy the noisome matter. Injunction to repress a lawful business is the harshest remedy available and should be used discreetly and sparingly, and a nuisance abated, when possible, without restraining the business."

A rehearing was granted, and eight of the judges concurred in the following decision:

"For these reasons, the judgment appealed from is reversed and the cause remanded with directions to the lower court to grant the appellants ninety days time within which to avoid the noxious odor, the appellants to recover their costs of this appeal."

The reasons spoken of are substantially those given in the dissent to the first opinion.

See, also, *Wilcox v. Henry,* 35 Wash. 591, 77 Pac. 1055, and *Hughson v. Wingham,* 120 Wash. 327, 207 Pac. 2, 27 A. L. R. 327, in both of which cases the nuisance was alleged to consist of offensive odors from slaughterhouses. These decisions are in accordance with the weight of authority. See 39 Am. Jur. 443, Nuisances, § 172, and particularly the the cases cited in the footnotes to that section.

The injunction appealed from will be set aside and the cause remanded to the superior court of Pierce county, with direction to note the action for a further hearing on the question as to whether or not the offensive odors have been eliminated and, upon such inquiry, to enter such order or injunction as the facts then shown shall warrant. Said

hearing shall not be held until at least two months after the reception of the remittitur in this case, unless the parties, with the court's consent, agree upon an earlier date.

BEALS, C. J., BLAKE, and JEFFERS, JJ., concur.