[No. 31227. Department Two. June 29, 1950.]

THE STATE OF WASHINGTON, *on the Relation of Albert N. Bradford, as Prosecuting Attorney for Walla Walla County, Appellant,* v. EMORY STUBBLEFIELD *et al., Respondents.*[1]

[1]Reported in 220 P. (2d) 305.

*Albert N. Bradford,* for appellant.

*Casey & Johnson,* for respondents.

HAMLEY, J.—This appeal is the outgrowth of a long series of proceedings in which it has been sought to permanently enjoin the operation of a fat-rendering plant as a public nuisance.

In 1945, Emory Stubblefield and his wife, Margaret Stubblefield, purchased forty-one acres of property near the city of Walla Walla. The total purchase price was $14,250. Soon afterwards Stubblefield, who will be referred to herein as if he were the only defendant and respondent, started fat-rendering operations on this property. The operation, as initially carried on, consisted of skinning and cutting dead animals and rendering them in open cookers. These dead animals were hauled to the premises in an open truck operated by Stubblefield, or were received from others who hauled in a similar manner.

The operations as then conducted resulted in the emanation of extremely disagreeable and nauseating odors which were carried over a rather wide surrounding area. This area for the most part is devoted to truck gardening on tracts varying in size from one to twenty acres, on many of which family homes are located. There are some forty or more homes within a radius of a half mile or less of the fat-rendering plant. The closest of these, except for the residences of Stubblefield and his tenants, is eight hundred to a thousand feet from the plant. There are some small commercial enterprises in the area, and the city sewage disposal plant is located about twenty-five hundred feet away.

In the summer of 1946, Stubblefield was served with a petition, signed by many nearby residents, advising him that the operation of the plant constituted a nuisance. In December, 1947, the prosecuting attorney of Walla Walla county, relator and appellant herein, received a letter signed by residents of the area requesting that appropriate action be taken to abate the asserted nuisance. As a result, relator instituted this action on December 23, 1947.

A hearing was held shortly thereafter, at which it was shown that defendant had by then constructed one wall and a concrete floor of a contemplated two-story building in which to house his operations. His total investment at this time was about fifteen thousand dollars. Following the hearing, a decree was entered on January 10, 1948, adjudging the fat-rendering plant to be a nuisance. Defendant was granted sixty days within which to eliminate the offensiveness of the plant. The court orally admonished defendant not to go to heavy expense unless he was certain he could remove the objectionable condition.

The matter again came on for hearing after the expiration of the sixty-day period, and additional evidence was taken. The court then entered a decree, dated April 7, 1948, abating the plant as a public nuisance, "due to the very obnoxious and unwholesome and offensive smells." The decree permitted defendant to continue operation of the plant until June 1, 1948, provided he made every effort to eliminate the offensive odors. The purpose of this provision was apparently to permit defendant to find another location for his plant. However, defendant did not attempt to find another location, feeling this course impracticable. He continued with the construction of his building and began making certain changes in equipment and operating methods in an effort to overcome objections to the plant. On June 8, 1948, apparently without further hearing, the court entered a decree which, after reciting that the offensiveness of the plant had not been eliminated, enjoined the defendant from any further operation of a fat-rendering plant at this location.

On June 29, 1948, relator instituted a contempt proceeding against defendant. Relator's affidavit recited that defendant was violating the injunction of June 8, 1948, by causing to be brought on his premises dead animals and offal which gave off obnoxious stenches and odors. This show cause matter came on for hearing on July 8, 1948. The evidence then received indicated that defendant had not operated the boilers, cookers and washers since entry of the injunction of June 8, 1948. He had, however, used the premises as a temporary collecting station for dead animals prior to transporting them elsewhere to another fat-rendering plant. He had also skinned and cut up some animals. By this time defendant had completed the construction of his two-story building and had an investment of about twenty-five thousand dollars. The court entered an order, dated July 16, 1948, reciting that use of the premises as a collecting station was not in violation of the decree of April 7, 1948, or of the injunction of June 8, 1948. The skinning and cutting of animals was held to be a technical violation of the decrees, for which defendant was not in willful contempt, it being provided that these activities must cease.

Defendant then confined his activities to the collection of dead animals. However, he continued making improvements to his premises in the apparent hope that he could gain court permission to resume fat-rendering operation. On November 16, 1948, defendant served upon relator a petition asking that the decree and injunction be modified to permit defendant to operate a fat-rendering plant on the premises

" . . . so long as the petitioner shall fully comply with the laws and regulations of the state of Washington and so long as the same shall be operated so as not to give off obnoxious, unwholesome or offensive smells and odors . . ."

A hearing was held on this petition in Jaunary, 1949. The matter was argued but no evidence was received. The court held that the injunction of June 8, 1948, did not prevent defendant from operating a fat-rendering plant on the premises if this could be done without noxious and offensive odors. The request for a modification of the injunction was

for this reason denied by order dated February 4, 1949. Thus the decision of the court, though in form denying defendant's petition, actually granted him the relief he sought.

Defendant then began operating his newly-equipped fat-rendering plant. On July 2, 1949, relator filed a petition, motion and affidavit, seeking to have defendant declared in contempt of court for violating the order of July 16, 1948. The petition also asked that the restraining order be modified to provide that the use of the premises for a collection station, and the hauling of dead animals to and from the property, is a nuisance, and enjoining such activities and the operation of a fat-rendering plant in this location. A number of nearby residents intervened at this stage of the proceedings. They sought a permanent injunction of the same kind applied for by relator.

The matter came on for hearing on July 27, 1949. At the outset relator waived his contempt proceedings. The only issues considered related to the civil action by relator and intervenors to abate defendant's operation as a nuisance. After a full hearing, the court entered findings of fact, conclusions of law and the decree from which this appeal was taken.

The findings of fact recite that the truck used by the defendant conformed to state regulations except that it lacked a metal lining for the upper part of the truck; that defendant's trucking operations had not been offensive since February, 1949; that the operation of the plant since that date had resulted in the escape of obnoxious odors which offended residents of the vicinity; that the area near the plant was occasionally subject to odors from a meat and cold storage company, the city sewage disposal plant, and pea vines raised in the surrounding gardens; that, because of these other odors, the evidence was conflicting as to the source of some odors attributed to defendant's plant; that the escape of obnoxious odors so as to be offensive to residents of the vicinity could be prevented by making seven specified improvements in the building, equipment and operating procedures; that the plant, as then operated, was not a source of

danger to the health and safety of the residents living in its vicinity, and was not in an improper location for a plant of this type; and that the plant was not a source of rat or fly infestation.

The seven improvements in the building, equipment and operating procedures, as specified in the findings of fact, were repeated in the conclusions of law. The decree, signed on the same day, August 15, 1949, contained these principal provisions:

". . . the defendants be, and they hereby are, enjoined from the operation of their fat rendering plant upon the premises described in the Findings of Fact in a manner that will allow obnoxious odors to escape to the premises of neighbors and residents in the vicinity of said plant.

". . . the defendants are permitted to continue operating a rendering plant upon the said premises upon the conditions that they made the improvements in said plant in accordance with the Findings of Fact and Conclusions of Law heretofore entered, on or before the 5th day of September, 1949, and that the defendants do not permit the escape of obnoxious odors to premises of neighbors.

". . . the Court retains jurisdiction in this matter to enter such further orders in the premises as might be required.

". . . the Intervening Complainants shall recover $73.80 costs herein."

Relator has appealed. While interveners have not separately appealed, they have joined in the briefs filed herein by relator.

Appellant's first four assignments go to the question of whether the court erred in permitting the fat-rendering plant to continue operations subject to certain terms and conditions. In support of these assignments it is first urged that the plant was a nuisance *per se* and should have been so adjudged.

The generally accepted definition of nuisance *per se* is set out in *Hardin v. Olympic Portland Cement Co.*, 89 Wash. 320, 325, 154 Pac. 450, as follows:

" 'A nuisance *per se* is an act, thing, omission, or use of the property which in and of itself is a nuisance, and hence is

not permissible or excusable under any circumstances.' 21 Am. & Eng. Ency. Law (2d ed.), p. 683."

See *Motor Car Dealers' Ass'n v. Haines Co.*, 128 Wash. 267, 222 Pac. 611, 36 A. L. R. 493; *McPherson v. First Presbyterian Church of Woodward*, 120 Okla. 40, 248 Pac. 561, 51 A. L. R. 1215; *Wilson v. Evans Hotel Co.*, 188 Ga. 498, 4 S. E. (2d) 155, 124 A. L. R. 373; Joyce, Law of Nuisances (1906), p. 20, § 12; Wood, Nuisances (3d ed.), vol. 1, p. 45, § 23; 39 Am. Jur. 289, Nuisances, § 11; 46 C. J. 648, Nuisances, § 5.

█ In keeping with the above definition, this court adheres to the almost universal rule that a lawful business is never a nuisance *per se. Hardin v. Olympic Portland Cement Co., supra.* See, also, *Grant v. Rosenburg (En Banc* opinion), 112 Wash. 368, 196 Pac. 626; *Hughes v. McVay*, 113 Wash. 333, 194 Pac. 565, 14 A. L. R. 681; *Motor Car Dealers' Ass'n v. Haines Co., supra*; *Turtle v. Fitchett*, 156 Wash. 328, 287 Pac. 7. Conversely, we have held that to engage in business in defiance of law is a nuisance *per se. Puget Sound Traction, Light & Power Co. v. Grassmeyer*, 102 Wash. 482, 173 Pac. 504. Among the types of business which we have held to be not nuisances *per se*, though they may become so in fact, are slaughter houses (*Hughson v. Wingham*, 120 Wash. 327, 207 Pac. 2, 27 A. L. R. 327) and piggeries (*State ex rel. Tollefson v. Mitchell*, 25 Wn. (2d) 476, 171 P. (2d) 245).

There is language in two of our decisions which seems to announce the rule that a lawful business can "become" a nuisance *per se.* In *Haan v. Heath*, 161 Wash. 128, 131, 296 Pac. 816, we said:

"Though an undertaking establishment is not of itself a nuisance *per se*, it may, by reason of surrounding circumstances, become one."

Read in context with the remainder of the opinion, however, this language must be taken to mean only that a lawful business may become a nuisance in fact—not that it may become one *per se.* In the *Haan* case it was found that the evidence supported the verdict of the jury for the plaintiff,

because the undertaking establishment, although a lawful business, had become a nuisance by reason of its improper location in a residential area. That the court had in mind this distinction between nuisance *per se* and nuisance *per accidens*, is shown by the comment in that decision that, in our earlier case of *Densmore v. Evergreen Camp No. 147, W. O. W.*, 61 Wash. 230, 112 Pac. 255, Ann. Cas. 1912B, 1206, 31 L. R. A. (N.S.) 608,

". . . injunctive relief was granted, not upon the ground that the undertaking business was a nuisance *per se*, but that, by reason of its location and the surrounding conditions . . ., it might be, or become, a nuisance." (p. 132.)

Language somewhat similar to the quoted portion of *Haan v. Heath*, relied upon by appellant, was also used in *Turtle v. Fitchett*, 156 Wash. 328, 337, 287 Pac. 7. But we there supported the statement with numerous citations, all of which involved lawful businesses which we held had become nuisances in fact, because of the particular circumstances of the case. It is readily apparent that to speak of a lawful business as "becoming" a nuisance *per se* would be a contradiction in terms. A nuisance *per se*, by definition, means an act, thing, omission, or use which "is not permissible or excusable under any circumstances," and hence has never been lawful.

A fat-rendering plant is a lawful business. It is sanctioned by statute and subject to licensing provisions administered by the director of agriculture of the state of Washington. Rem. Supp. 1947, §§ 2541, 2541-1 (Laws of 1947, chapter 172, §§ 12, 13, p. 797), repealed and superseded by Rem. Supp. 1949, §§ 3142-1 to 3142-23 (Laws of 1949, chapter 100, p. 215).

We therefore hold that the trial court was not in error in failing to adjudge respondent's plant a nuisance *per se*.

The contention appears to be made, in some portions of appellant's brief, that the decree of April 7, 1948, absolutely enjoined any future operation of the plant, regardless of whether offensive odors could be avoided, and that this ruling bound the trial court and rendered that court power-

less to modify the decree to permit operation of the plant under any conditions.

The history of the proceedings, the unqualified language of the June injunction, and the recitals in the July order resulting from the contempt proceedings, all tend to support appellant's view that an unconditional abatement of the plant was intended. The April and June orders were apparently so construed at the time by respondent as well as appellant. This is indicated by the fact that respondent did not feel at liberty to renew fat-rendering operations after June 8, 1948, even though he believed further offense could be avoided, without first applying for and obtaining a modification of the decree and injunction.

On the other hand, the April decree, which was in a sense preliminary to the June injunction, contains explanatory words indicating that the plant was found to be a nuisance "due to the very obnoxious and unwholesome and offensive smells." There was a recital in the June order to the effect that the offensiveness of the plant had not been eliminated. But there was no finding or recital in either order to the effect that it would be impossible or impracticable for respondent ever to overcome the nuisance features of the operation. Thus it might be inferred that the orders in question were intended only to restrain any *offensive* operation of the plant.

Had the court based the April and June orders upon a finding that it would be impossible or impracticable to operate the plant in such manner as to avoid offense, there is little doubt that an unconditional injunction would have been appropriate, in view of the previous opportunity which had been accorded respondent to overcome the difficulty. *Grant v. Rosenburg*, 112 Wash. 361, 192 Pac. 889, 196 Pac. 626. But, where such a finding has not been made, the usual remedy is to restrain the operation until the condition has been corrected, rather than to unconditionally abate the business. *Hughson v. Wingham, supra*; *State ex rel. Tollefson v. Mitchell, supra.* An example of such a decree is to be found in *Wilcox v. Henry*, 35 Wash. 591, 600, 77 Pac. 1055,

where the operation of a slaughter house was enjoined. We there said:

"The decree does not necessarily abolish appellant's business. It does restrain appellant from conducting the business, and from permitting others to conduct it, 'to the injury of the plaintiff and other residents.' If the appellant obviates all the noxious odors complained of, and thereby so conducts the business as not to injure or annoy the respondent, he is permitted under the decree to do so; otherwise the business should be suppressed."

In addition to the factors mentioned above, there is another circumstance which we must take into consideration. Respondent's petition for modification of the April decree and the June injunction so as to permit inoffensive operations, was acted upon by the trial court in February, 1949. The court denied the petition upon the ground that the June injunction did not restrain inoffensive operations, thus in effect ruling in favor of respondent. If this interpretation of the June order was in fact incorrect, then the February order constituted a modification of the earlier injunction and would seem to be an appealable order. Appellant took no appeal from the February order, and respondent, relying upon that order, went to the expense of reopening the plant for what he hoped would be a nonoffensive operation.

It is not necessary for us to decide whether appellant's failure to appeal the February order now binds us to the interpretation which that order placed upon the June injunction. The facts that the June order was so interpreted, that such interpretation was at that time apparently acquiesced in by appellant, and that respondent acted in reliance upon that interpretation, all go to create a situation in which it would be unfair for us to now go behind the February 4, 1949, order and consider anew the scope of the previous decree and injunction.

We have not lost sight of the fact that the order of February 4, 1949, did not expressly refer to the decree of April 7, 1948, although the proper interpretation of that decree was placed in issue in the pleadings which were before the court. But the injunction of June 8, 1948, purporting to

"perpetually and permanently" enjoin and restrain respondent from operating a fat-rendering plant, went further and was more absolute in form than the injunctive provisions of the April decree. Hence, the provisions of the earlier decree may be said to have been merged in, or succeeded by, the injunction of June 8, 1948, the result being that the April decree does not now have separate force and effect.

Even were we to assume that the April decree and June injunction were originally intended as unconditional restraints upon operation of the plant, and that the circumstances surrounding the entry of the interpretive order of February 4, 1949, should not affect our determination of the matter, we would hesitate to rule that the trial court was forever precluded from modifying the decree. It is generally recognized that a court of equity has inherent power to modify or vacate a permanent preventive injunction where a change in circumstances demonstrates that the continuance of the injunction would be unjust or inequitable or no longer necessary. The authorities announcing this rule are set out in the well-reasoned and thoroughly documented decision of the supreme court of appeals of West Virginia in *Edlis, Inc. v. Miller*, 51 S. E. (2d) (W. Va.) 132. That court was able to find only two cases which suggested (and then only by way of dicta) a contrary rule. The court summarized its review of the law on this point in the following words:

"The cited cases, in which the power of the court which entered a final decree awarding a permanent preventive injunction to modify or vacate the injunction after the expiration of the term at which the decree was rendered by subsequent proceedings in the same suit was involved, uniformly recognize the power as inherent in a court of equity and uphold its exercise by the court in subsequently modifying or vacating the injunction where there has been a change in the controlling facts which gave rise to the issuance of the original injunction. Their holdings on that question are sustained by the preponderant weight of judicial authority in this country." (p. 141.)

See, also, 43 C. J. S. 956, Injunctions, § 218; 28 Am. Jur. 494, Injunctions, § 323; annotations in 68 A. L. R. 1180 and 136 A. L. R. 765. The power of the court to modify a permanent injunction was apparently recognized, though not exercised, in *Pacific Tel. & Tel. Co. v. Henneford,* 199 Wash. 462, 92 P. (2d) 214. The existence of this inherent power of a court to modify its own injunctions at a time when the power to modify a judgment at law would have ceased to exist is based upon the principle that a preventive injunction is fundamentally different from any other judgment or decree. *United States v. Swift & Co.,* 286 U. S. 106, 76 L. Ed. 999, 52 S. Ct. 460.

■ For all of the foregoing reasons, we conclude that neither the April 7, 1948, decree, nor any other previous order precluded the trial court from entering the decree appealed from.

The question is then presented whether, considering the case upon its merits on the evidence submitted at the trial court hearing, the court erred in decreeing that respondent might operate the plant in the future if the emanation of noxious odors could be avoided.

It is to be observed that the trial court specifically found that the manner in which the plant was operated at the time of the trial constituted a nuisance. The decree expressly enjoins the continuance of that nuisance. This injunction is also renewed as a condition attached to the provision of the decree relative to specified improvements in equipment and operating methods. Thus the making of such improvements, while mandatory, does not relieve respondent from the responsibility of operating in an unobjectionable manner. Should it transpire that these or other improvements are unavailing in overcoming the nuisance conditions, the decree places respondent under the definite duty to cease operations.

The issue is thus narrowed to the question of whether the trial court should have ruled that no possible changes in plant or operating methods could overcome the objections complained of, and that further operations should therefore have been permanently and unconditionally enjoined.

Extensive testimony was received at the trial court hearing, all of which has been carefully examined. The state and interveners produced thirty-four witnesses, and respondent produced thirty-three. Most of this testimony was directed to conditions at and preceding the trial. The evidence was conflicting as to the extent of improvement with respect to odors, but that there had been some improvement was rather definitely established. The principal testimony as to the prospect of completely overcoming the nuisance conditions in the future came from Dr. Marvin R. Hale, district veterinarian for the department of agriculture of the state of Washington. He was called originally by appellant and the interveners below, and was later recalled by the court. He described the plant and its operations in detail, listing a number of improvements which had been made and others which should be made.

Dr. Hale indicated that administration of the new law regulating such plants (Rem. Supp. 1949, §§ 3142-1 to 3142-23 [Laws of 1949, chapter 100] had just begun, and that frequent inspections and effective enforcement were contemplated. It was his testimony that prior to the trial court hearing, respondent had been given a written order by the state agency requiring a number of improvements in plant and changes in operating methods. The seven improvement items listed in the decree were taken from this list, being those which related particularly to the elimination of offensive odors. Dr. Hale testified that plants of this kind were operating in other cities of the state without constituting a nuisance, even with respect to persons residing very close to the plant.

Giving appropriate consideration to this evidence, it cannot be said that the trial court erred in affording respondent this further chance to overcome the disagreeable conditions which have always been associated with his operations.

We realize that respondent has been given several previous opportunities to make this correction. The affected neighbors cannot be expected to put up with nuisance con-

ditions forever, while respondent experiments with his operation in the hope of eliminating the offensive odors. The time may come when these neighbors may be entitled to a court ruling that this operation is of such character that there is no practicable method of eliminating the nuisance, and that the use of the plant must therefore be unconditionally abated.

But here there was new evidence of improvements already achieved; a definite and required program of further improvements for the future; expert testimony by appellant's own witness that such plants could operate inoffensively; and the assurance of continued surveillance by a state agency under a new regulatory law. The trial court recognized these factors by providing in its decree that respondent could have one more chance to operate inoffensively. The court also recognized the inherent rights of nearby residents by requiring specified improvements to be made, expressly prohibiting nuisance conditions regardless of improvements made, and retaining jurisdiction in the matter to enter such further orders as may be required. That these provisions were recognized as of substantial advantage to the protesting residents of the area is indicated by the fact that the interveners were regarded as the prevailing parties and were granted judgment for costs against respondent. On the whole, we feel that the court decree in question dealt with this difficult problem in a mannner which is fair to all concerned.

Appellant's assignments of error Nos. 6, 7, 8 and 9 challenge some of the findings of fact and conclusions of law upon which the principal provisions of the decree are based.

■ This being an action in equity, findings of fact were not required. However, since findings of fact were made and brought before us in the record, they will be considered and given great weight. *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 126 P. (2d) 584; *Davis v. Altose*, 35 Wn. (2d) 807, 215 P. (2d) 705. A thorough examination of the record leads us to believe that the findings in question are supported by the preponderance of the evidence. We likewise

believe that the conclusions in question (relating to the seven specified improvements) are appropriate in view of the findings.

Appellant's remaining assignment of error, No. 5, questions the sufficiency of the evidence to support the following recital in the findings of fact:

"That in the carrying of said material the defendants have not, since the 9th day of February, 1949, carried on their business with respect to the operation of their trucks in such a manner as to offend persons using the public highways, or persons residing in the vicinity thereof, by offensive odors or otherwise."

Presumably because of this finding of fact, the court did not incorporate in its decree any provision relative to the manner in which dead animals may be hauled to the plant. Both appellant and interveners had requested that respondent be enjoined from hauling dead animals to and from the premises. Manifestly, the court could not enjoin all hauling of dead animals to the plant after having decreed that the plant could continue operating in an inoffensive manner. The question presented, then, is whether the evidence preponderates against the above finding, and in favor of a finding which would have called for some provision in the decree prescribing the manner in which such hauling could be carried on.

Eleven of the witnesses for the state and interveners and three of the witnesses for respondent testified regarding the hauling operations. No useful purpose will be served by outlining all of the testimony on the point. It may be said, however, that Dr. Hale testified that respondent's truck would, with a slight improvement, meet state requirements. Based upon this testimony, the court recited in the findings of fact immediately preceding the portion of the findings quoted above:

"That the truck customarily used by the defendants in collecting said material, at the time of trial, conforms to the requirements of the State of Washington with the exception of its lacking a metal lining for the upper part thereof."

■ We are of the opinion that the evidence preponderates in favor of the findings in question.

Those findings would have supported a provision in the decree requiring respondent to complete the metal lining in the truck. But the evidence shows that state authorities have already called respondent's attention to the matter, and have asked him to make the correction. If he fails to do so, state officials have ample authority under Rem. Supp. 1949, §§ 3142-1 to 3142-23, providing for the licensing of rendering plants, to enforce the requirement. If they fail to do so, appellant and interveners may invoke the continuing jurisdiction of the court below, as reserved in the decree. Accordingly, we do not find error in the failure of the court to include such a provision in the decree of August 15, 1949.

There was evidence indicating that other individuals, not parties to this action, hauled dead animals to the plant in a manner which was objectionable. If this condition continues, it is a matter for the state agency to deal with as an enforcement problem, or appellant and interveners may be entitled to institute a separate equity action against such persons. Since these persons were not parties in this proceeding, there is no way in which the trial court could have dealt with the problem in the decree appealed from, save by completely abating the operation of the plant. It would not be proper to penalize respondent in this fashion for the dereliction of other persons. Respondent now has the statutory duty, under Rem. Supp. 1949, § 3142-13 (2), (5), to see that all vehicles and containers used in hauling are cleaned before leaving the plant.

The judgment is affirmed.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.