[No. 31419. Department Two. December 28, 1950.]

E. F. AKERS, *Appellant*, v. K. E. SINCLAIR *et al., Respondents.*
E. F. AKERS, *Appellant*, v. WILLARD SEDGE *et al.,*
*Respondents.*

RAYMOND L. NEBEKER, *Appellant*, v. WILLARD M. SEDGE
*et al., Respondents.*[1]

[1]Reported in 226 P. (2d) 225.

*Cheney & Hutcheson* and *Harcourt M. Taylor,* for appellants.

*Halverson & Applegate* and *Jack M. King,* for respondents.

HAMLEY, J.—These three actions, consolidated for trial and appeal, began as suits in equity to reform three certain promissory notes on the ground of mutual mistake.

Each plaintiff sought an adjudication that the note in question constituted an obligation of Dr. Wells Yakima Bottling Company, a corporation, and not of the plaintiff as an individual. In each case the defendant payee denied that there had been a mutual mistake, and cross-complained for judgment on the note. The corporation and its receiver were made parties to the action, but did not enter appearances and are not involved in this appeal.

After trial to the court, a single judgment was entered disposing of all three cases. In each case reformation was denied and the payee defendants, Sinclair and Sedge, were awarded judgments against the respective plaintiffs, and the corporation, for the principal amounts of the notes, with interest and attorneys' fees. Plaintiffs have appealed.

The Dr. Wells Yakima Bottling Company was organized by Thurston Lane in June, 1946. The corporation issued

fifty-one per cent of its common stock to Lane in exchange for the franchise to distribute the Dr. Wells drink in the Yakima area. Lane had obtained this franchise from the parent Dr. Wells Bottling Company. The balance of the common stock was issued to certain individuals, including appellants, who paid for their stock in cash. The corporation also issued and sold certain preferred stock. In order to obtain additional financing for the company, Lane negotiated loans with several individuals, including these loans with the respondents, K. E. Sinclair and Willard M. Sedge.

All three notes were made out on printed forms. The note dated June 27, 1948, involved in the Akers v. Sinclair case, is in the amount of three thousand dollars, and was to become due on June 27, 1950. This note, omitting portions not essential for our purpose, and with the parts filled in by pen indicated by italics, reads as follows:

"*Dr. Wells Bottling Co.* after date, without grace *we* promise to pay to the order of *K. E. Sinclair* . . . *We, Dr. Wells Bottling Co.* promise and agree to pay in addition to the costs and disbursements provided by statute, a *reasonable attorneys fee.* . . .

Thurston Lane, Pres. [Signed]
E. F. Akers [Signed]"

The note dated July 9, 1948, involved in the Akers v. Sedge case, is in the amount of one thousand dollars, and was to become due on July 9, 1950. The essential portions of this note read as follows:

" . . . *We, Dr. Wells Bottling Co.* promise to pay to the order of *Willard Sedge* . . . We promise and agree to pay in addition to the costs and disbursements provided by statute, *a reasonable attorneys fee* . . .

Thurston Lane, Pres. [Signed]
E. F. Akers [Signed]"

The note dated July 16, 1947, involved in the Nebeker v. Sedge case, is in the amount of one thousand dollars, and was to become due on July 16, 1949. The essential portions of this note read as follows:

" . . . *We* promise to pay to the order of *Willard M. Sedge* . . . and do *we* hereby agree that if collected by

an attorney . . . do *we* further promise and agree
. . . .

> Dr. Wells Bottling Co.   [Signed]
> Thurston Lane, Pres.   [Signed]
> Raymond L. Nebeker   [Signed]"

The Akers-Sinclair note of June 27, 1948, was a renewal note issued upon the maturity of a note executed one year earlier. The negotiations regarding this original note took place early in June, 1947, before the company began bottling. Lane visited Sinclair at the latter's home for the purpose of securing a loan for the company. Sinclair is a retired stock rancher and has had little experience in dealing with corporations. At this conversation Sinclair declined to make a loan, but indicated Lane might call back later for a further discussion. No mention was made, in this conversation, as to how the note would or should be signed.

Lane returned to Sinclair's home a week or ten days later for a second conversation. Sinclair testified that, at this conversation, he told Lane that "if I had Aker's name on the note and made Akers responsible for it" he (Sinclair) would make the loan. Sinclair testified that he did not know any other parties in the corporation, "and I knew Mr. Akers and I knew he was good . . ." Lane testified that Sinclair asked him who would sign the note, and that he, Lane, had explained that the note had to be signed by Lane and another officer of the corporation. Lane further testified that he told Sinclair that either Akers or Nebeker would sign it "for us," and that Sinclair had indicated a preference for Akers. Lane stated that Sinclair at no time indicated that the loan would be made only if Akers obligated himself individually.

At this time Lane was president of the corporation, Akers was vice-president, and Nebeker was secretary-treasurer. Lane indicated several times in his testimony that either Akers or Nebeker was authorized to join Lane in the execution of corporate notes. However, the by-laws provided that corporate obligations should be executed by the president and secretary. Lane prepared the original note

(dated June 27, 1947), signed it with the designation "Pres." after his signature, took it to Akers for his signature, and then delivered it to Sinclair.

This original note was mislaid and believed lost during the early part of the trial, and the parties testified from memory as to how it was signed. Both Akers and Lane testified that Akers placed the letters "V. P." after his signature at the time of signing the note. Sinclair testified unequivocally, however, that there was no designation of any kind after Akers' signature. He stated that he was sure of this, not only because he had examined the note when it was delivered to him, but also because he had compared it with the renewal note a year later and had observed that both were alike in so far as Akers' signature was concerned.

This original note was discovered among the papers of the receiver before the close of the trial. The note had the letters "V. P." after Akers' signature, thus confirming Akers and Lane's recollections. When confronted with the actual note, Sinclair at first testified: "I don't remember seeing this 'V. P.' on it." Later, Sinclair reaffirmed his earlier testimony that when the original note was renewed he had compared the two notes and found that neither carried any designation after Akers' signature. Akers then testified that he had never seen the original note after its execution. When that note was paid off by issuance of the renewal note, Lane received it back from Sinclair, marked a large "X" across it, and placed it in the files of the corporation. Akers had legal access to these files, but he and Lane testified that Akers did not make use of them for any purpose. A few months later, and before this controversy arose, the corporation went into receivership. The receiver then took possession of the corporate papers, including this original note.

As before indicated, the Akers note of June 27, 1948, here in controversy, was issued in renewal of the original note discussed above. Sinclair, testifying prior to the discovery of the original note, stated that he agreed to the renewal "if the note was made out and signed just the same as the first

one." No specific mention of Akers' name was made during the negotiations for the renewal note. Sinclair testified that it was his intention that it would be a corporation note, but that "Akers was to be responsible for it." Sinclair indicated that at the time the renewal note was executed nothing had happened to cause him to question the solvency or financial responsibility of the company.

Both Lane and Akers testified that they intended the original and renewal notes as only corporate obligations. Lane testified that, after the controversy arose, he went to Sinclair and reminded Sinclair that the note was not to be the personal obligation of Akers, and that Sinclair replied: "Yes, but he did sign it as an individual." The purport of this conversation was denied by Sinclair. Akers stated that his omission of the letters "V. P." after his signature on the renewal note was due to the fact that at the time he was at the company office signing company checks, wherein it was not the practice to indicate his official capacity.

The Nebeker-Sedge note, dated July 16, 1947, was also executed before the completion of the company's plant. Sedge is a fruit farmer with only limited experience regarding corporate affairs. Lane and Sedge had three conversations before this loan was made and note issued. These conversations took place in Sedge's home or on his grounds, with Mrs. Sedge present for some of them. Sedge at first declined to make the loan, being apparently unimpressed with the company's prospects. He criticized the flavor of the drink and the small size of the bottle. Sedge testified that in one of these conversations he agreed to make the loan if he had "security" or "somebody [to] go the company note." Sedge further testified that Lane then mentioned the names of those backing the company, including Nebeker and Akers. Sedge knew Akers, and Lane described Nebeker as a prosperous retired farmer. Mrs. Sedge testified that she did not know whether the word "security" was used. She also testified that Lane had said that Nebeker and Akers were behind the "note." Later she modified this, saying she had meant to say that Lane told her and her

husband that Nebeker and Akers were "backing the company."

Lane testified that he told Sedge all about the corporation and named the stockholders. He did not remember the word "security" being used in any of these conversations. It was also Lane's testimony that neither he nor Sedge mentioned specific endorsements of individuals on the notes. Nebeker prepared this note. He and Lane testified that they intended it only as a corporate obligation. Nebeker's explanation for his failure to append his corporate designation was the same as that given by Akers.

After the note was signed by Nebeker and Lane, the latter took it to the Sedge home. Sedge was not there at the time, but he testified that he had left instructions with his wife to deliver the check and receive the note "if the note was signed by Mr. Akers or Mr. Nebeker." In so testifying, Sedge corrected testimony he had given in a deposition six months earlier, to the effect that he was present when Lane brought this note, and examined the signatures before he paid over the money. Mrs. Sedge corroborated her husband's trial testimony, and further stated that when Lane brought the check he told Mrs. Sedge, "I got Mr. Nebeker to sign the note." Mr. and Mrs. Sedge testified that they intended the note to bind Nebeker individually, in addition to the corporation.

The Akers-Sedge note, executed on July 9, 1948, resulted from further negotiations between Lane and Sedge. By that time the corporation was a going concern. It had switched to more popular soft drinks, and had need of additional bottles and another truck. Lane met Sedge casually in a grocery store one day, and Sedge then indicated his willingness to loan more money a little later. They discussed the matter again shortly before the note was executed. It was Sedge's testimony that he told Lane "if they would secure it like the other one [note]," Sedge would make the loan. Sedge testified that he intended the note to bind both the corporation and Akers. Lane testified that individual signers were not mentioned in these conversations, and that Sedge never indicated that he would require

an individual signer. Both he and Akers testified that they intended only to bind the corporation. Akers gave the same explanation for his failure to add a corporate designation to his signature as he gave in connection with the Akers-Sinclair note.

It is undisputed that both respondents understood that the loans represented by these notes were for the sole benefit of the company. The company received and used all such proceeds. Appellants received no payment or compensation whatsoever. It is also undisputed that all parties intended the notes to be the valid obligations of the corporation. The only interest payment made on any of the notes was made by the corporation.

On January 20, 1949, after the company had gone into receivership, demand was made upon Nebeker for payment of the note he signed. This note was then delinquent due to failure to pay annual interest. At the same time, Akers was informed in writing that Sedge and Sinclair proposed to hold him personally liable on the notes he signed. These notes were not then delinquent, but became so before the trial. On February 28, 1949, Sinclair and Sedge filed claims on these notes in the receivership proceeding, "without prejudice" to their asserted rights against "co-makers and guarantors." No payments on these notes have been made in the receivership proceeding.

At the close of the trial, the court took the consolidated case under advisement. Sometime later a comprehensive memorandum opinion was filed. The court held that the notes should be reformed, not in the manner requested by appellants for the purpose of relieving them of personal liability, but in such manner as to definitely establish the notes as the obligations of both the appellants and the corporation. Specifically, the court indicated that the two Akers notes should be reformed so that the signatures of the makers on each would appear as follows:

> "Dr. Wells Yakima Bottling Co.
> "By Thurston Lane, Pres.
>     and E. F. Akers, Secretary
> "E. F. Akers."

The court indicated that the Nebeker note should be reformed so that the signatures of the makers would appear as follows:

"Dr. Wells Yakima Bottling Co.
"By Thurston Lane, Pres.
    and Raymond L. Nebeker, Secretary
"Raymond L. Nebeker."

Consonant with the memorandum opinion, a judgment was entered accomplishing this reformation and awarding respondents recovery against appellants and the corporation on the notes as so reformed. No findings of fact or conclusions of law were filed.

The first eleven assignments of error present the question of whether, under the evidence and the law applicable thereto, it was error for the trial court to deny appellant's application for reformation of any or all of these notes to relieve appellants of personal liability thereon.

This is an action in equity, before this court for trial *de novo*. It is therefore our duty to examine the entire evidence and the surrounding circumstances as disclosed by the statement of facts, and from such examination determine whether the judgment entered is supported by the evidence. *Columbia Lbr. Co. v. Bush,* 13 Wn. (2d) 657, 126 P. (2d) 584; *Widman v. Maurer,* 19 Wn. (2d) 28, 141 P. (2d) 135. Had findings of fact been entered, we would have accorded them great weight. *Widmar v. Maurer, supra; Darnell v. Noel,* 34 Wn. (2d) 428, 208 P. (2d) 1194. But a memorandum opinion, although helpful to this court, does not have the standing of findings of fact, within the above rules. *Clifford v. State,* 20 Wn. (2d) 527, 148 P. (2d) 302; *In re Sipes,* 24 Wn. (2d) 603, 167 P. (2d) 139.

Reformation of these notes was sought by appellants on the ground of mutual mistake. It was their claim that all parties to each instrument intended that such instrument would evidence only a corporate obligation. It was further alleged that, through mutual mistake, the parties failed to note that the signatures were in such form as to evidence

the individual liability of Akers and Nebeker, respectively, contrary to the intention of the parties.

Respondents did not seek reformation of the notes in any respect. Yet it became evident that the notes would require reformation even to give effect to respondents' view that Akers and Nebeker were liable on the notes in addition to the corporation. This is true because the signatures of two officers were necessary to bind the corporation. Thus, if Akers and Nebeker signed only as individuals (as asserted by respondents), then only one officer signed each instrument. The court recognized this problem and, having found with the respondents on the facts, ordered the instruments reformed so as to show Akers and Nebeker's names *twice* on the respective instruments.

■ The rule applicable where reformation for mutual mistake is sought has been stated in Restatement of Contracts, as follows:

"Where both parties have·an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either ·party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will .not be unfairly affected thereby." 2 Restatement of Contracts, 968, § 504.

■ This rule has long been followed in this state. See *Moeller v. Schultz*, 11 Wn. (2d) 416, 119 P. (2d) 660, and cases there cited; *Nadreau v. Meyerotto*, 35 Wn. (2d) 740, 215 P. (2d) 681. It extends to cases involving the reformation of negotiable instruments. *Union Machinery & Supply Co. v. Taylor-Morrison Logging Co.*, 143 Wash. 154, 254 Pac. 1094; 3 Pomeroy's Equity Jurisprudence (5th ed.), 395, § 871a; 45 Am. Jur. 596, Reformation of Instruments, § 25. Such an instrument may be reformed to show that it was signed by an agent for the purpose of binding the principal only. 1 Williston on Contracts (Rev. ed.), 885, § 302. This reformation may be accomplished by adding a signature. *Smith v. Cram*, 113 Ore. 313, 230 Pac. 812.

Appellant contends that the degree of proof required in actions to reform for mutual mistake is a mere preponderance of the evidence. *Edwards v. Thompson,* 99 Wash. 188, 169 Pac. 327; *Vanasse v. Cavey,* 167 Wash. 238, 9 P. (2d) 60; *Darnell v. Noel, supra,* are cited in support of this proposition. In the *Edwards* case we said that the decision was "supported by a vast preponderance of the evidence." In the later case of *Robinson Lettuce Farms v. Symons,* 163 Wash. 351, 1 P. (2d) 300, we stated that the rule was well established that in such cases the evidence must be "clear, cogent and convincing." It was expressly held that this rule was not modified by the language used in *Edwards v. Thompson, supra.* The *Vanasse* decision, decided after the *Robinson* case, again uses the words "clear preponderance of the evidence." But later in the same opinion, the court makes clear that it does not mean to depart from the rule that such evidence must be clear, cogent and convincing. In the recent *Darnell* case, the court does not, as argued by appellant, imply that this rule applies only in cases involving fraud. What the court there held was that the rule, applicable in fraud cases, that *uncorroborated* evidence of the vendee is insufficient to establish fraud by clear, cogent and convincing evidence, is not applicable in an action for rescission on the ground of misrepresentation as to the boundary line.

We therefore reaffirm the long-established rule in this state that clear, cogent and convincing evidence is necessary to sustain an action for reformation on the ground of mutual mistake. See *Robinson Lettuce Farms v. Symons, supra; Huston v. Graham,* 169 Wash. 521, 14 P. (2d) 44; *Peterson v. Paulson,* 24 Wn. (2d) 166, 163 P. (2d) 830; *Kessinger v. Anderson,* 31 Wn. (2d) 157, 196 P. (2d) 289; *Nadreau v. Meyerotto, supra.*

We have sometimes said that where any doubt exists as to the intent of the parties, reformation will not be granted. *Carew, Shaw & Bernasconi v. General Cas. Co.,* 189 Wash. 329, 65 P. (2d) 689; *John Hancock Mut. Life Ins. Co. v. Agnew,* 1 Wn. (2d) 165, 95 P. (2d) 386; *Maxwell v.*

*Maxwell,* 12 Wn. (2d) 589, 123 P. (2d) 335. However, the mere denial that a mistake was made will not defeat an action for reformation. *Fay v. Best,* 137 Wash. 1, 241 Pac. 354; *Bitter Root Creamery Co. v. Muntzer,* 90 Mont. 77, 300 Pac. 251. Nor is it necessary that the plaintiff's proof be uncontradicted. *American Freehold Land Mortgage Co. v. Pace,* 23 Tex Civ. App. 222, 248, 56 S. W. 377, 391.

█ In determining this question, the courts will look into the surrounding circumstances, and will take into consideration all facts which throw light upon the intention of the parties. *Fay v. Best, supra.* Parol evidence is admissible for this purpose. *Meyer v. Young,* 23 Wn. (2d) 109, 159 P. (2d) 908; *Nadreau v. Meyerotto, supra*; 3 Pomeroy's Equity Jurisprudence (5th ed.), 350, § 858; 2 Restatement of Contracts, 981, § 511; 45 Am. Jur. 584, Reformation of Instruments, § 3.

Bearing these principles in mind, we turn to an examination of the evidence. The testimony is undisputed that Akers and Nebeker, who signed these notes, intended only to bind the corporation. But the testimony is in serious conflict as to whether this intention was shared by Sinclair and Sedge, who made the loans. They positively assert that they intended to bind Akers and Nebeker individually, in addition to the corporation, and that this intention was made known to Lane, who negotiated the loans. Sedge's testimony in this regard was corroborated in some respects by Mrs. Sedge. In other respects, as indicated in the above summary of testimony, Mrs. Sedge's testimony throws doubt upon her husband's version.

Lane was in no position to say what the secret intentions of Sinclair and Sedge may have been. He did deny, however, that any such intention was made known to him. He also testified that the intention of Akers, Nebeker and Lane, that these notes represent only corporate obligations, was made known to Sinclair and Sedge in the various conversations which were had, and that Sinclair and Sedge apparently acquiesced in this understanding of the transactions.

A careful review of this conflicting testimony leaves with us the distinct impression that Lane's version is entitled to more credence. Sinclair and Sedge were aware that the loans were for the sole use and benefit of the corporation. Their contention that they regarded Akers and Nebeker's personal obligations as essential does not find persuasive support in the record. It is not surprising that Lane, Sinclair and Sedge could not remember the precise details of all the conversations. But Lane's testimony, on the whole, appeals to us as being more candid and less confused on important points.

Moreover, Lane was a disinterested witness, while Sinclair and the Sedges had a vital interest in the outcome of the litigation. Lane's credibility is also enhanced by the fact that he correctly recalled how the original Sinclair note was signed. Sinclair's credibility, on the other hand, suffers by reason of the fact that his recollection was proven faulty on that point. Likewise, Sedge's credibility was weakened by the fact that, at the trial, he had to retract positive testimony he gave in a deposition six months earlier.

The only mutual intention which is undisputed and conceded by all parties is that the notes were to bind the corporation. In order to accomplish this, the notes had to be signed by another officer of the corporation in addition to Lane, the president. Akers and Nebeker were other officers of the corporation. They signed the respective notes only once. Hence their contention that they signed only on behalf of the corporation is consistent with the established mutual intention of binding the corporation. On the other hand, respondents' contention that the signatures were intended to bind Akers and Nebeker individually is inconsistent with the established mutual intention of binding the corporation, for Akers and Nebeker's single signatures could not bind both themselves and the corporation.

With respect to the two Akers notes, there are other factors which must also be considered. In the body of each of these notes the "Dr. Wells Bottling Co." is named as the sole promisor. In connection with this corporate name, the

pronoun "we" is also used. But, when used in this way, "we" can only mean the corporation. The nominative "we" is often used in a note to designate a corporate aggregate. *Aungst v. Creque,* 72 Ohio St. 551, 74 N. E. 1073; *Wright v. Drury Petroleum Corp.,* 229 Mich. 542, 201 N. W. 484; *Reifeiss v. Barnes,* 166 S. W. (2d) (Mo.) 225; 1 Daniel on Negotiable Instruments (7th ed.) 529, § 455. If the notes had recited "Dr. Wells Bottling Co. *and* we the undersigned promise to pay," then of course "we" would not refer to the corporation. See *Nunnemacher v. Poss,* 116 Wis. 444, 92 N. W. 375.

Section 20 of the uniform negotiable instruments law (Rem. Rev. Stat., § 3411 [P.P.C. § 757-39]) relates to the liability of agents, and reads as follows:

"*Where the instrument contains* or a person adds to his signature *words indicating that he signs for or on behalf of a principal,* or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of words describing him as an agent, or as filling a representative character, without disclosing his principal, does not exempt him from personal liability." (Italics ours.)

In *New Georgia Nat. Bank v. J. & G. Lippmann,* 249 N. Y. 307, 164 N. E. 108, 60 A. L. R. 1344, Judge Cardozo, then chief justice of the New York court of appeals, after reviewing the early court decisions regarding the liability of agents, made the following oft-quoted observation regarding § 20:

"The statute, as we read it, sweeps these subtleties away. Whenever the form of the paper is such as fairly to indicate to the eye of common sense that the maker signs as agent or in a representative capacity, he is relieved of personal liability if duly authorized." (p. 311)

A similar view regarding § 20 was expressed in *Carre v. Seaman,* 38 Del. 197, 190 Atl. 564, where the court said:

"The language of the instrument, or the addition to the signature, is sufficient to put the offeree of the instrument on notice and inquiry as to the existence and extent of the authority of the agent or representative. He is not compelled to accept the instrument, but, if he does, he takes it,

primarily at least, for what it purports to be, an engagement not of the one who actually signs it . . ." (p. 203)

See, also, *Armstrong, Adm'r v. Kirkpatrick,* 79 Ind. 527; 1 Daniel on Negotiable Instruments (7th ed.), pp. 528, 531, §§ 455, 458.

One court has held that where a corporation is named in the body of the note as the sole promisor, only the corporation is bound, no extrinsic evidence being required. *Shaver v. Ocean Mining Co.,* 21 Cal. 46. At the very least, notes in this form and so signed are ambiguous as to the persons liable. *Germania Nat. Bank v. Mariner,* 129 Wis. 544, 109 N. W. 574.

Akers is therefore not in the position of asking for reformation of an instrument which, on its face, unambiguously binds him as an individual. On the contrary, it seems to us that the Akers notes, when read as a whole, strongly corroborate the testimony of Akers and Lane. To be consistent with the body of the notes, the signature of Akers would have to be regarded as only for the purpose of binding the corporation, the only named promisor. If Sinclair or Sedge intended to gain the promise of Akers as an individual, the burden was upon them to have the body of the note reworded, or the signature affixed twice, so that the note would not purport to be only the promise of the corporation.

Four decisions of this court, cited by respondents, are clearly distinguishable. They are *Toon v. McCaw,* 74 Wash. 335, 133 Pac. 469, L. R. A. 1915A, 590; *Way v. Lyric Theater Co.,* 79 Wash. 275, 140 Pac. 320; *Farmers' State Bank of Newport v. Lamon,* 132 Wash. 369, 231 Pac. 952, 42 A. L. R. 1072; and *Moore v. Webster,* 191 Wash. 394, 71 P. (2d) 369. These were all actions at law brought by the payees against the signatories on the notes. In each case the body of the note omitted any reference to the corporation and simply recited "I promise to pay," or "we promise to pay." The names of the corporations were appended as signatures, followed by the names of the defendants who had failed to indicate their official corporate office. The court held in each

case that such notes contained no ambiguity tending to impair the personal liability of the defendants. Parol evidence for the purpose of showing that the defendants signed for the corporation was therefore held to be inadmissible. The rule of these cases, as summarized in the *Moore* case, is as follows:

"One who executes a note in his own name, with nothing on the face of the note showing his agency, cannot introduce parol evidence to show that he executed it for a principal, or that the payee knew that he intended to execute it as agent." (p. 396)

In the *Toon* case, the court used the following language, which was quoted with approval in the relatively recent *Moore* case:

"There is no language in the note which raises even a slight ambiguity or creates any doubt as to the meaning of the instrument, or that remotely suggests that the makers were acting for another." (p. 337)

Not only is the instant case one in equity, for reformation, where the parol evidence rule is inapplicable, but the two Akers notes now under discussion did each contain the name of the corporation as the sole promisor.

With respect to the Akers-Sinclair note, there is an additional element of great significance. It is undisputed that this was a renewal note. It is also undisputed that Sinclair sought no more protection on the renewal note than on the original. Before the original note was discovered and produced at the trial, Sinclair testified that he had requested that the renewal note be signed the same as the original note. He further testified that he examined the two and found that this had been done. When produced, the original note was found to contain the initials "V. P." after Akers' signature.

Unless we are to find that someone tampered with the original note after it was paid and returned to Lane, the conclusion seems inescapable that, as to the Akers-Sinclair renewal note, both parties intended that Akers would sign only as an officer of the corporation. See *Renihan v.*

*Piowaty,* 94 Ind. App. 523, 179 N. E. 568, where the court reached a like conclusion in a similar situation.

We find no evidence of tampering here. Lane and the receiver of the corporation, two disinterested witnesses, testified that the note was not within Akers' or Lane's possession or reach at the time or after this controversy arose. It is this circumstance which distinguishes the instant case from *Moore v. Webster, supra,* where the court declined to find significance in the fact that an earlier note between the parties carried the designation "sect. & treas." after the signature.

The trial court apparently disregarded the renewal note circumstance, for the reason that under the by-laws of the corporation, Akers, as vice-president, had no authority to bind the corporation. There was uncontradicted testimony, however, that it was the practice to have such obligations signed by any two of the three officers. Moreover, the corporation definitely recognized that note as its obligation; otherwise it would not have felt obligated to negotiate a renewal.

■ Giving consideration to the form of the Akers notes; the renewal circumstances involving the Akers-Sinclair notes; the fact that Akers' single signature is consistent with his version, and inconsistent with respondents' version that both individual and corporate liability was intended; the relative credibility of the witnesses; and all of the extrinsic evidence, as summarized above, we are of the opinion that appellant Akers has established his claim for reformation by evidence which is clear, cogent and convincing.

■ We are not able to draw this conclusion with respect to the Nebeker note. There was no renewal factor tending to substantiate Nebeker's claim. Nebeker prepared this note himself. While it set out the name of the corporation as a part of the signature, it does not name the corporation in the body of the note. It reads simply: "*We* promise to pay" followed by the signatures: "Dr. Wells

Bottling Co., Thurston Lane, Pres., Raymond L. Nebeker." Thus "we" does not necessarily refer to the corporation. Nebeker's case is therefore dependent solely upon the oral testimony, which was in conflict upon essential points. While this evidence may preponderate in favor of Nebeker's position, we believe that it falls considerably short of the clear, cogent and convincing evidence necessary to warrant reformation.

█ Assignments of error Nos. 12 to 18 deal with the trial court's rulings as to the admissibility of certain testimony offered by Lane. Assignments 16 and 18 were not argued in the briefs and may be disregarded. Assignment 14 relates only to the Akers notes and need not be considered, in view of the disposition of the Akers cases, as indicated above.

We have carefully examined the remaining assignments relative to the exclusion of testimony, but believe it unnecessary to discuss them in detail. The testimony referred to in assignment 12 was properly stricken, under the best evidence rule, but in any event was later received without objection. The testimony involved in assignment 13 was not responsive to the question. The testimony dealt with in assignment 15 constituted a conclusion of the witness. There was no prejudicial error as to the exclusion of testimony discussed under assignment 17, since the witness was several times thereafter permitted to give this testimony.

The only other assignment of error pertains to the action of the trial court in permitting Sedge to file an amended cross-complaint late in the trial. Counsel for Nebeker advised the court at that time that he did not join in the objection to the late filing of this pleading. Since Akers' appeal is being reversed on other grounds, it is therefore unnecessary to consider this assignment.

The judgment is affirmed as to appellant Nebeker, and reversed as to appellant Akers. The cause is remanded with directions to enter judgment in accordance with this

opinion. Respondents' application for the allowance of reasonable attorneys' fees on this appeal is disallowed.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.

February 21, 1951. Petition for rehearing denied.

