[No. 31544.  Department Two.  April 19, 1951.]

JOSEPHINE THOMAS, *Appellant*, v. CHARLES C. HENSEL, as *Executor, Respondent.*[1]

[1]Reported in 230 P. (2d) 290.

458

*Seltzer & Seltzer*, for appellant.

*C. M. McCune, John A. Godfrey*, and *S. C. Rutherford*, for respondent.

HAMLEY, J.—This action was instituted to compel specific performance of an oral contract to devise certain real property and bequeath the personal property located thereon. According to the allegations of the complaint, plaintiff was employed by Levi H. Hensel, referred to herein as Hensel, to perform household and nursing services during the last illness of Mrs. Hensel. This employment began in January, 1939, and continued, at an agreed compensation, for somewhat more than a month, when Mrs. Hensel died. Hensel then orally promised plaintiff that, if she would continue on as his housekeeper, he would, as com-

pensation, make a will leaving her the Seattle home and personal property located therein.

The complaint further alleges that plaintiff, relying upon this promise, agreed to stay and care for Hensel. She thereafter resided continuously on the premises until August 1, 1948, faithfully caring for Hensel and also contributing financially to his support. Plaintiff then, with the consent of Hensel, took a leave of absence to care for her own mother, who was then seriously ill. In January, 1949, in response to Hensel's request, plaintiff returned to again care for him. However, prior to her resuming this role, Hensel's son, Charles C. Hensel, came up from California and took decedent back to that state. Hensel died at Lakeside, California, on June 2, 1949. It then developed that, notwithstanding his promise, Hensel had, on April 20, 1946, executed a will devising and bequeathing the property in question to his son and the latter's wife. Charles C. Hensel caused this will to be probated and seeks to have the property awarded and distributed as provided in the will. On the basis of these allegations, plaintiff asked for a decree of specific performance requiring defendant to convey the property to plaintiff.

Defendant's answer denies the allegations of the complaint respecting the alleged oral contract to devise and plaintiff's performance in reliance thereon. The answer contains a cross-complaint in which it is alleged that plaintiff's action constitutes an attack upon the will and that defendant is therefore entitled to recover from plaintiff a reasonable attorney's fee, in the sum of five hundred dollars, for the defense of this action.

The trial court, following a two-day trial, entered findings of fact to the effect that Hensel and Mrs. Thomas had entered into a contract of the kind described in the complaint, but that Mrs. Thomas had not performed under the contract for a number of years and it was therefore no longer in effect. Judgment was accordingly entered dismissing the complaint and allowing defendant statutory costs. Plaintiff has appealed.

Several assignments of error raise the question of whether the evidence shows, as the trial court found, that appellant failed to perform the services contemplated by the parties.

■ The rule as to the burden and degree of proof in this class of cases is stated in *Blodgett v. Lowe,* 24 Wn. (2d) 931, 938, 167 P. (2d) 997, as follows:

"In order to establish a contract such as here alleged to have been made, it is necessary that the person asserting it show by evidence that is conclusive, definite, certain and beyond legitimate controversy (1) that a contract as alleged was entered into between the deceased and the person asserting the contract; (2) that the services contemplated as consideration for such agreement have been actually performed; and (3) that such services were performed in reliance upon the agreement."

To the same effect, see *Henry v. Henry,* 138 Wash. 284, 286, 244 Pac. 686; *Dau v. Pence,* 16 Wn. (2d) 368, 371, 133 P. (2d) 523; *Jansen v. Campbell,* 37 Wn. (2d) 879, 227 P. (2d) 175.

Applying this rule to the immediate question in the instant case, the issue presented is whether appellant has sustained the burden of showing, by evidence that is conclusive, definite, certain, and beyond legitimate controversy, that, in reliance upon Hensel's oral promise of February, 1939, she continued to render, up to the time Hensel left for California, the services contemplated by that promise.

■ ■ The trial court thought not, as indicated by its findings of fact. This being an action in equity, findings of fact were not necessary at the time this judgment was entered. Where such findings have been entered, however, we have considered them and given them great weight. *State ex rel. Bradford v. Stubblefield,* 36 Wn. (2d) 664, 220 P. (2d) 305; *Akers v. Sinclair,* 37 Wn. (2d) 693, 226 P. (2d) 225. In a case similar to this, we sanctioned the rule that, where the evidence is conflicting or appears to be evenly balanced, the findings of the trial court usually will not be disturbed. *Carey v. Powell,* 32 Wn. (2d) 761, 779, 204 P. (2d) 193. It is nevertheless incumbent upon us to examine the entire evidence and surrounding circumstances as

disclosed by the statement of facts. *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 666, 126 P. (2d) 584; *Akers v. Sinclair, supra.* This has been done.

In order to measure the sufficiency of appellant's performance, it is first necessary to determine what services on her part were contemplated when Hensel made his promise in February, 1939. This information is supplied through the testimony of Mrs. Anna Erickson, who had known Hensel and his wife for many years. She testified that, on the day of Mrs. Hensel's funeral, she was present when Hensel made this promise. Her testimony on the point is as follows:

"A. Mr. Hensel asked Mrs. Thomas to please stay and take care of him as he did not have anyone else to look after him and to do the housework for him because he was not able to cook and look after himself. Q. Did he mention how he was going to pay Mrs. Thomas? A. Well, he told Mrs. Thomas and myself that he did not have any money to pay her wages to do the housework for him but if she would stay he promised to give her the property at the time of his death."

It will be noted, from this, that Hensel intended appellant to live at the house and to do the housework and cooking until the time of his death. The expressions "take care of him" and "look after him" also indicate that it would be appellant's duty to do other usual and ordinary tasks in connection with the maintenance of the home, such as grocery shopping, washing, and mending. The fair intendment of those terms is also that appellant would care for Hensel in the event of illness. At this time Hensel was sixty-five or sixty-six years of age.

The evidence clearly indicates that appellant immediately undertook the duties specified by Hensel. She occupied a room in Hensel's home and did the housekeeping, cooking, and other household tasks. Hensel was then employed and continued such employment until April, 1941. He retired at that time, and thereafter his only income consisted of monthly disability payments in the amount of twenty-eight dollars.

This reduction in Hensel's income brought about a substantial change in the arrangements between Hensel and appellant. He was apparently no longer able to pay the entire costs of the household. Appellant therefore sought and obtained employment in the laundry at Firland Sanatorium. She worked a regular shift from eight a. m. to five p. m., at Firland, from sometime in 1941 to August, 1947. She received a monthly wage of one hundred eighty-five dollars, from which Firland, by arrangement with her, deducted thirty-five dollars a month for room and board. Appellant stated that the room at Firland was used mainly as a place for her to change her clothes at the beginning and end of the day's work. However, according to her testimony, she did stay overnight at Firland about one night a week and took some of her meals there.

Appellant testified that, during this period when she was employed at Firland, she resided at the Hensel residence most of the time. She stated that she continued to do the housework and most of the cooking, and paid for at least half of the groceries. During this same period, however, appellant also had another residence of her own. From 1939 to 1945 she owned a home. She disposed of this in July, 1945, and then rented an apartment, which she still retained at the time of the trial. The evidence is not clear as to how much of her time she spent in this other home and apartment. On cross-examination she testified:

"A. Well, sometimes I wasn't there because I had my own apartment or my own home. Q. Well, when you had your own apartment you wouldn't take care of him, would you? A. Well, yes, if he was sick I would take care of him. . . . Q. Well, you lived at his house, didn't you? A. Yes, part of the time. I had an apartment other places and a home other places."

Appellant testified that she took care of Hensel before and after his hospitalization for an operation in 1943. In August, 1947, appellant quit working at Firland. She then began doing day work and housekeeping at private homes. During that year she also made several trips to Friday Harbor to care for her mother. These trips required her to

be absent from the Hensel home for a total period of about six weeks. Appellant stated that she continued with the housekeeping and cooking at the Hensel home, except as interrupted by the trips to Friday Harbor, until July, 1948.

In that month, appellant's mother broke her hip, and appellant admittedly spent a good deal of her time at Friday Harbor from that time on. It was her testimony that she would care for her mother for a week or two at a time, and then return to the Hensel home for a few days. The last time she stayed at the Hensel home, according to her testimony, was in October, 1948. In December, 1948, Hensel asked her to return. According to her testimony she did so, but found Hensel's son there and, not wishing to intrude on the privacy of father and son, did not stay nights at the home. Hensel and his son, as before indicated, left for California in January, 1949. Hensel did not return prior to his death on June 2nd of that year.

There was considerable testimony in support of appellant's version, covering the period from 1939 to 1943 or 1944. The evidence pertaining to appellant's work at the Hensel home, after 1944, however, provides very scanty corroboration of appellant's testimony. A. M. Milota, a close personal friend of appellant, testified that Mrs. Thomas kept house and cooked regularly for Hensel until "towards '48." He said her work at the home then "slowed down a little" because there was someone else also living at the house at that time. Milota was asked, on cross-examination, whether he had been around the house enough to be sure of his statement as to appellant's continued work for Hensel. His reply was:

"A. Well, I wasn't around there only a little while. I didn't stay there. I just stayed a little while, and then went away. I had to do other things. Q. So you really don't know too much about what she did do? A. Oh, yes. Q. Now she cooked all his meals and everything? A. Yes."

Mrs. Erickson, of Tacoma, Washington, a witness who has been referred to above, testified that she visited the Hensel home three or four times a year up until the time Hensel left for California. It was her testimony that Mrs.

Thomas was always present and was doing the housework and cooking.

Respondent presented several witnesses who gave testimony tending to indicate that, for the last few years prior to Hensel's departure for California, appellant spent very little of her time at his home. J. F. LaVarne, a former neighbor, and a friend of Hensel for many years, resided at Hensel's home during a good part of the last three years of Hensel's life. He testified that Mrs. Thomas was rarely on the premises, and that Milota would frequently call to inquire concerning her whereabouts. Another witness, Mrs. Fannie G. Straiton, had known Hensel for twenty-five years, and lived across the street. She stated that she made neighborly visits to the Hensel residence every other day or so after Mrs. Hensel's death, and that, from 1946 to 1948, Mrs. Thomas was there "hardly any." Mrs. Ouldhause, another neighbor, testified that she and her husband would visit Hensel about every week, and found appellant there on only about three occasions. Three other witnesses, who visited Hensel less frequently, including two who were relatives of Hensel, gave testimony of similar import.

Charles E. Hensel testified that he came up from California in December, 1948, when he heard from friends and relatives that his father was not feeling well. Charles found the elder Hensel "in pretty bad shape," although he could still make his way up and down stairs for the purpose of carrying coal and wood. The son stayed with his father five or six weeks, and then they both left for the son's home in California. At Hensel's request, Charles returned to Seattle in May, 1949, for the purpose of selling his father's property. Charles testified that he told appellant at this time that the property was to be sold, and that she inquired how much he wanted for it. He further testified that when he told her the price she said that she had been interested in it, but that it was too much money for her.

Appellant confirmed part of Charles' testimony, stating under cross-examination as follows:

"Q. You heard Mr. Charles Hensel's testimony this morning, Mrs. Thomas, to the effect that he told you he was here to sell the house? A. Yes. Q. Did he so advise you when he was here? A. Yes, I went out there one day, and he said he was going to sell the house. Q. And did he tell you how much he wanted for it? A. Yes, I asked him what he was going to sell it for, and he says 'eleven thousand dollars.' Q. And did you tell him that you weren't interested in it at any price, like that? A. I just asked him because I wanted to know. THE COURT: How is that? THE WITNESS: I asked him because I just wanted to know out of curiosity. Q. (by Mr. McCune) You weren't interested?— A. No. Q. —in buying the place then? A. No. Q. Did you ever indicate to anyone that you were interested in buying the place? A. No, I didn't. I wasn't ever interested in buying the place. Q. You weren't interested in buying? A. Never. Q. And you never told anybody that you were interested in buying? A. No."

Appellant was then cross-examined as to whether she had not written to Hensel in California expressing an interest in buying the property. She testified that Hensel had written to her, saying that he was going to sell, and that she had replied, asking him the price "just for curiosity." She then reaffirmed her previous testimony that she was not interested in buying "because I had no money to buy." Appellant was then asked if she had not written to Hensel that she was interested in buying the property. Her reply was: "Just to find out what he would sell it for." Pressed further on cross-examination, appellant finally stated that she wrote the letter to Hensel "for somebody else." This new explanation was repeated and a reason why her own claim was not asserted was added, when appellant was examined by the trial court a few minutes later. This testimony is, in part, as follows:

"Q. And you talked about buying the property yourself, did you? A. Oh, in that letter I did, but that wasn't for me; that was for another party. Q. Well, you talked about having Mr. Hensel sell that property to another party then; that is what you had in mind? A. Well, I just wanted to break him down and see what he could— Q. (interrupting) Now just answer my question. That is what you were asking about. Now if you were claiming that property as your

own, why would you seek to buy it for somebody else? A. I just wasn't — at that particular time, after Mr. Hensel went down there and wasn't coming back, I figured that I was all out. Q. You figured you didn't have any claim on the property? A. Not after he was going to sell it; not after he went down there and was going to stay. Q. Well, what made you feel that way about it? A. Because I was to take care of Mr. Hensel as long as he lived— Q. Yes. A. — and when they took him away from here, from me, why then he was with them, and I had no idea then that I would get anything from him. Q. So that at the time you wrote this letter you felt that for one reason or another you weren't entitled to the property? A. Well, I felt that I would get nothing out of it, and I just let it go at that."

The letter in question, dated April 19, 1949, was introduced in evidence. The pertinent portion reads as follows:

"Yes I would like very much to buy that place of yours its about what I want now. I have to take care of my mother now and Lena has had a nervous breakdown and she has to go to a nerve specialist she can't do any work so if I had that house I could look after her and Mother together and if I could get one more old lady I could make out fairly well. I could raise some shrubs to sell and have a little garden besides. I didn't want it to sell it again as property is really going down in price so I've been told, only water-front property is still being held high."

Reviewing the evidence summarized above, it seems to us that the turning point in this whole transaction came in April, 1941, somewhat more than two years after the original arrangement was made. Hensel then found it necessary to retire on a meager disability allowance, and the original plan whereby appellant would devote her full time to the household was no longer feasible. Perhaps a reasonable rearrangement of that plan, not involving a revocation of Hensel's offer and promise, may be implied from appellant's continued work at the home evenings and week-ends for the first two or three years after she began working at Firland. The fact that, after an oral contract has been entered into, it is found necessary for the promisee to work elsewhere a portion of the time to supplement the income

of the two, does not necessarily terminate the contract. *In re Hilbert's Estate*, 14 Wn. (2d) 475, 128 P. (2d) 647.

It is apparent, however, that appellant drifted farther and farther away from the Hensel household as time went on. She maintained her room there and frequently returned to do housework and cooking, or to care for Hensel when he was ill. Nevertheless there were weeks at a time when she was entirely absent, and the evidence strongly indicates that in 1947 and 1948 she was away the greater portion of the time. Many of these absences were for the laudable purpose of caring for appellant's aged mother, and for this appellant is certainly not to be criticized. The fact remains, however, that for the last two or three years, at least, of Hensel's life prior to his departure for California, he did not receive any fair share of the services he had originally bargained for, or may have agreed to accept at the time of readjustment in the spring of 1941.

It is neither possible nor necessary to fix the exact time when performance on appellant's part fell so far below that contemplated that the contractual arrangement must be considered as having terminated. Hensel apparently regarded the arrangement at an end as early as April 20, 1946. It was on this date that he executed his will, leaving the property to others. There is also good reason to believe that in April, 1949, two months or more before Hensel's will became known to her, appellant herself considered that she had no claim against the property.

Her letter of April 19, 1949, is very persuasive as to this, though not conclusive. Considering appellant's economic background and lack of business experience, this letter, standing alone, perhaps cannot be regarded as a considered waiver or acknowledgment that she had no claim on the property. But when we read that letter in the light of appellant's explanations on the witness stand, we feel impelled, as did the trial court, to give it great probative value as evidence against appellant.

Appellant offered two explanations for the letter: that she wanted to know the price as a matter of "curiosity;" and that she was inquiring the price on behalf of someone

else, whose identity was not disclosed. She insisted that she was not interested in buying the property for herself. However, the reason she gave for this was not that she thought she was entitled to the property under the agreement, but only that she did not have the money. Appellant did not testify, as suggested in her brief on appeal, that her letter may have represented a "tactful approach of the plaintiff to the conscience of the deceased." Nor does the letter itself lend substance to that suggestion.

At the very close of appellant's cross-examination, appellant stated, in effect, that the reason she did not press her own claim in this letter was because she thought Hensel's departure for California destroyed her claim. This may be the true explanation, but, when read in context with all of her testimony, it sounds very much like an afterthought. Had she kept her claim alive by substantial performance through the years, down to the time Hensel left this state, it is hard to believe that she would have failed to make some mention of it, or any protest against the proposed sale. This is true regardless of what she may have supposed her legal rights to be.

█ In this class of cases, statements or conduct of the promisee, inconsistent with the later claim of an oral contract, will be given due weight in the final determination of the question of fact as to whether there was such a contract as that asserted. 69 A. L. R. 212, annotation. Appellant, however, cites *Olsen v. Hoag*, 128 Wash. 8, 221 Pac. 984, as demonstrating that failure of the promisee to protest against a proposed sale of the property is of little significance. The court there said:

"It is asserted by counsel for respondent to be somewhat surprising that Cooney, after making the will in favor of appellant, offered his real estate for sale and sold a portion thereof, gave his deed, talked with appellant about it, upon which she made no protest, and got and asked for no portion of the money. There is nothing astonishing about that. If there were a contract between appellant and the deceased, the contract, as represented by the will that he made and delivered to her, was that he gave and devised unto her all the property, both real and personal which he might

own or possess. She might have understood and believed that he would have the sole use and benefit of all the property that he then owned, and that she would get all of which he died possessed, and no more." (pp. 12-13.)

It will be observed that the alleged contract in the *Olsen* case was subject to the interpretation that the promisor was to receive all property of which the promisee died possessed. Thus the sale of any portion of the property by the promisor would not breach the contract and would give no occasion for a protest. In the instant case, however, the alleged promise is to devise a particular parcel of real estate. Any proposal by the promisor to sell that particular parcel would most certainly threaten an infringement of the promisee's rights, if the contract was then in effect. The justification for a protest or assertion of rights, absent in the *Olsen* case, would therefore be clearly present here.

A case more nearly in point is *Payn v. Hoge*, 21 Wn. (2d) 32, 149 P. (2d) 939. This was an action to compel the defendants specifically to perform an alleged oral contract to devise a particular parcel of real estate. In affirming a judgment for the defendant, this court said:

"The court's view was, to some extent at least, influenced by the fact that appellants latterly had endeavored to buy the property from the respondent, and thus had taken a position utterly inconsistent with their theory of a contract under which they would be entitled to present possession and ultimate ownership of the property.

"Without going into further detail, we will say that we are in full accord with the trial court's views and are convinced that appellants have not established their alleged oral contract by the degree of proof required in such cases." (pp. 44-45.)

■ In our opinion, the evidence, taken as a whole and giving due regard to the high degree of proof required in such cases, does not preponderate against the trial court's findings relative to appellant's nonperformance and the resultant nonexistence of the contractual arrangement prior to Hensel's departure for California.

■ Our conclusion in this regard disposes of all but one of appellant's assignments of error. In that assignment it

is urged that the trial court erred in finding that the oral contract to devise had been rescinded and abandoned, where such abandonment had not been affirmatively pleaded or urged by defendant at any time in the pleadings or trial.

The findings of fact recite that the contract had been "abandoned" prior to Hensel's death. However, we do not believe that the trial court used that term in the technical sense of a mutual abandonment or rescission. Whether this was a bilateral or a unilateral contract (and the latter seems more likely) the burden was upon appellant to establish, as a part of her case, that there had been substantially full performance. All evidence tending to contest the allegation of performance was therefore admissible under respondent's general denial. The evidence tends to indicate that appellant simply stopped performing. It was in this sense that the trial court found that the contract had been "abandoned." This assignment is without merit.

The judgment is affirmed.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and GRADY, JJ., concur.