ROY F. DOWDING ET AL., APPELLEES, V. WILLIAM T.
DOWDING ET AL., APPELLANTS, IMPLEADED WITH
FRED DOWDING, APPELLEE.
40 N. W. 2d 245

Filed December 12, 1949.   No. 32661.

*Spencer & Neumeister,* for appellants.

*Lloyd E. Peterson* and *Betty Peterson Sharp,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, grantees in a warranty deed executed and delivered to them by grantor in his lifetime, brought this action against defendants, sole heirs at law of grantor, deceased, to reform description of the property erroneously described therein by error or mistake of the scrivener. Plaintiffs were nephews, and defendants were brothers of grantor. Defendant Fred Albert Dowding, father of plaintiffs, entered a voluntary appearance, and thereafter defaulted. Defendants William T. Dowding and John Dowding, Sr., in an answer traversed by plaintiffs, denied delivery of the instrument, denied that there was any consideration therefor, and alleged that as a voluntary conveyance it was not subject to reformation.

After hearing upon the merits, the trial court entered its decree finding generally for plaintiffs, ordering reformation of the instrument, and quieting title to the property thus described in plaintiffs, as prayed by them. Motion for new trial, filed by defendants William T. Dowding and John Dowding, Sr., was overruled, and they appealed, assigning that the trial court erred: (1) In the admission of evidence over appropriate objections; and (2) that the judgment was contrary to law and not sustained by the evidence. We conclude that the assignments should not be sustained.

With reference to the first assignment, plaintiffs called defendant Fred Albert Dowding as a witness, whereupon the other defendants objected to the admission of that portion of his testimony relating to relevant

transactions or conversations with deceased during his lifetime as in violation of section 25-1202, R. R. S. 1943. The objections were overruled.

Section 25-1202, R. R. S. 1943, provides: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse party is the representative of a deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the witness, * * *." Exceptions appearing thereafter are unimportant here.

At the outset it should be observed that under the issues presented, plaintiffs prayed for the same relief against all three defendants, who were concededly adverse parties and representatives of deceased. If plaintiffs were awarded a judgment, the result of the action would of necessity be operative alike upon all defendants to deprive them and each of them of all interest in the property as heirs at law. Likewise, if defendants were awarded a decree, plaintiffs would of necessity receive nothing, and defendants would each respectively, as heirs at law, have an equal one-third interest in the property. Their direct legal interest in the result of the action, meaning the judgment, it will be then noted, was coincidental, and not adverse to the representatives of deceased. In other words, defendant Fred Albert Dowding did have a direct legal interest in the result of the action, but it was identical with all other codefendants who objected to his testimony. Thus his interest would not disqualify him as a witness under the statute.

As construed by this court, section 25-1202, R. R. S. 1943, prohibits persons having a direct legal interest in the result of any civil action or proceeding from testifying to any transaction or conversation had between the deceased person and the witness when the adverse party is the representative of a deceased person and their interest is adverse to that of the representative who makes appropriate objection and does not waive the prohibition.

In Parker v. Wells, 68 Neb. 647, 94 N. W. 717, this court said: "The object of this section was to prevent a party testifying against the representatives of a deceased person, where the interest of such party in the result of the action is of such a character as to hold out a temptation to perjury to such an extent as to run counter to the policy of the law."

In Hageman v. Estate of Powell, 76 Neb. 514, 107 N. W. 749, following Parker v. Wells, *supra,* and quoting from Wylie v. Charlton, 43 Neb. 840, 62 N. W. 220, it was said: "Having in view the common law as to competency, and the mischief which this statute sought to prevent, it should be construed as if it read that no person having a direct legal interest in the result of an action shall be permitted to testify, when the party interested adversely to the witness' interest is the representative of a deceased person."

Thereafter, in Anderson v. Estate of Akins, 99 Neb. 630, 157 N. W. 334, this court held: "A witness who has a direct legal interest in the result of the litigation is not incompetent under section 335 (329) of the Code, if such interest is not adverse to the representative of the deceased." See, also, Craig v. Seebecker, 135 Neb. 221, 280 N. W. 913; Nelson v. Nelson, 133 Neb. 458, 275 N. W. 829; Geise v. Yarter, 112 Neb. 44, 198 N. W. 359.

The mere fact that the witness also held a deed similarly executed and delivered by grantor to other property not involved in this litigation or directly affected by the result, and that he was father of plaintiffs, did not disqualify him as a witness or bar admission of his testimony, but could only have affected its credibility. In re Estate of Jelinek, 146 Neb. 452, 20 N. W. 2d 325; Craig v. Seebecker, *supra;* Rogers v. Casady, 134 Neb. 227, 278 N. W. 267; Oft v. Ohrt, 128 Neb. 848, 260 N. W. 571; Sorensen v. Sorensen, 56 Neb. 729, 77 N. W. 68.

In the light of the foregoing, it becomes unnecessary to discuss the question of whether or not disclaimer or specific exceptions in the statute qualified the witness.

Whether or not there was a delivery of the deed, and if so, whether or not it was subject to reformation, depends primarily upon legal principles applicable to evidence, about which there was no dispute.

The record discloses that the grantor lived all of his life in or near Palmyra. He never was married. His death occurred on April 19, 1948, at age 67. His three brothers, defendants, survived him as heirs at law. Defendant Fred Albert Dowding had two sons, plaintiffs, who from childhood had a friendly, close personal association and family relationship with their uncle, the grantor, in their respective homes and business affairs. Grantor originally lived on the farm involved for many years with his mother, grandmother of plaintiffs. Roy F. Dowding, one of the plaintiffs, lived with them while he went to school for sometime after he became five years of age.

Roy F. Dowding married in 1934, and in the same year, although still living in town, started farming the property involved for his uncle, the grantor, on an equal crop sharing plan, which continued until 1942, when the grandmother died. In April of that year, grantor moved to town and Roy moved out on the farm and operated the same on an equal crop and livestock sharing plan until grantor's death. During that period, grantor went out to the farm almost daily, and assisted in its operation, at which times he had noon and evening meals with the nephew, his wife, and family. Roy furnished the groceries at his own expense. He also furnished transportation and meals upon numerous business and pleasure trips during each year to and from Omaha, Lincoln, and elsewhere.

Plaintiff Harold A. Dowding, the other nephew, married in 1938, and started farming some three miles from the farm involved. Thereafter he assisted Roy and grantor with farm work, as they did him, when extra help was needed. Harold also furnished grantor transportation and expenses to and from Lincoln and sur-

rounding towns upon numerous occasions each year.

Grantor usually spent Sundays with his brother Fred or his nephews, the plaintiffs. Occasionally, but not often, he visited with other members of the family. However, they seldom visited him. During his last illness from October to April, his brother William and his two sons visited grantor in the hospital upon a few occasions, while the other defendant, John Sr., did not visit him at all.

At this point we call attention to the fact that while then at the hospital grantor told one of William's sons: " 'My personal property and my real estate,' * * * 'I can't do with it what I want to do with it.' " Also, when the other son of William made inquiry of grantor with regard to what he had done with his estate, he replied: " 'Fred's had it fixed out'." That evidence was adduced by defendants.

On July 8, 1947, as requested by grantor, the brother Fred and his wife went to grantor's home early in the morning. He was not feeling well, and as requested, they took him to a physician in Elmwood. They then returned to Palmyra, where, at the request of grantor, Fred called the cashier of the First National Bank at Unadilla and asked him to come to grantor's home. Grantor was a regular customer of that bank, where he had a bank account and a safe deposit box. The banker arrived between 10 and 11 a. m. There grantor, in the presence of Fred and his wife, informed the banker that he wanted to transfer his property, and asked the banker to make out deeds for all his real property, and draw a will. The banker inquired of him what property he wanted to transfer, and asked if he had any old deeds or anything of that sort from which he could get correct descriptions of the property to be transferred. Four 1946 real estate tax receipts, containing correct descriptions of all the real property then owned by grantor, were produced. Thereupon, at direction of grantor, the banker made a written memorandum on each receipt,

respectively designating the names of the parties to whom he wanted the property deeded. On the tax receipt describing the southeast quarter of Section 24, Township 9, Range 9, 160 acres in Otoe County, property involved herein, the banker thus designated plaintiffs as the parties to whom grantor wanted the property deeded.

Not having any deed forms with him, the banker returned to Unadilla and drew four separate deeds, purportedly pursuant to the memorandum and descriptions on the respective tax receipts. One of them was the warranty deed here involved. It designated George Henry Dowding, single, as grantor, and plaintiffs as grantees, and recited a consideration of "One Dollar, love and affection." The scrivener then returned to grantor's home where grantor, after holding the deed in his hand and looking it over, signed it as well as the other three deeds not involved herein, in the presence of the scrivener, who signed as a witness, and took grantor's acknowledgment.

Following execution of the deeds, the banker drew a will for grantor, disposing only of his personal property, which will was then and there duly executed by him. Such will was regularly admitted to probate without contest after testator's death.

At the same time and place grantor, at his own request and direction, signed a bank record card, making his bank account joint with his brother Fred, with right of survivorship. He also signed an order giving Fred access to his safe deposit box, and making it joint with right of survivorship. In that connection, after July 8, 1947, grantor did not draw on his bank account. Also, on that date, grantor gave Fred his key to the safe deposit box, which was thereafter continuously and exclusively in his possession and custody, and thereafter grantor never entered the box again. No one in the bank had keys to the box.

After the deeds and will were executed, they were given by the banker to grantor, who handed them to his

brother Fred, saying: " 'Take them, and put them away and keep them.' " The banker, while still there, received them from Fred in an envelope and took them back to Unadilla, where they were placed in the bank vault.

When the foregoing business transactions were completed, grantor went to a hospital in Lincoln where he remained until the first part of August 1947. During that month, after returning from the hospital, grantor gave Fred various other documents evidencing conveyance of the real estate involved, including the deed by which grantor originally acquired title to the property, and the original abstract of title thereto. Fred placed those instruments in the safe deposit box at Unadilla, where also, a day or two after July 8, 1947, he had placed the deeds and will drawn by the banker.

Between August and October, when he entered the hospital a second time, grantor went out to the farm involved from time to time, collected a portion of his share of the rents, and arranged to have some soil conservation work done, which was started in December 1947 and was almost but not entirely completed at the time of his death. Following grantor's death, Fred, in the presence of plaintiffs, who had never previously seen the deed but had known of its existence ever since two or three days after its execution and delivery, removed same from the safe deposit box and filed it of record.

After the deed involved was so recorded, the banker saw it, and upon comparison with the tax receipt from which it was drawn, noticed a discrepancy in the description. He had, contrary to grantor's express direction and intention, mistakenly and erroneously described the property in the deed as the southwest quarter of Section 24, Township 9, Range 9, whereas it should have been described as the southeast quarter of such section. None of the parties had ever noticed the error of description until they saw it in the newspaper after the deed was recorded. The fact was that grantor owned the southeast quarter but never owned the southwest quarter, which

belonged to defendant William T. Dowding, who testified that he was only concerned about its clouding of the title to his own property, and that otherwise the deed would not have concerned or made much difference to him.

Whether or not a deed was delivered ordinarily depends upon the intention of the grantor, determinable from the facts and circumstances of each particular case. No particular acts or words are necessary to constitute delivery of a deed, but anything done by the grantor, whether by words or acts or both combined, from which it is apparent that delivery was intended and that the instrument thereby without reservation passed beyond the dominion, control, and authority of the grantor, is sufficient. Black v. Romig, 151 Neb. 61, 36 N. W. 2d 772; Colbert v. Miller, 149 Neb. 749, 32 N. W. 2d 500; Kula v. Kula, 149 Neb. 347, 31 N. W. 2d 96; Kellner v. Whaley, 148 Neb. 259, 27 N. W. 2d 183; Newell v. Pierce, 131 Neb. 844, 270 N. W. 469.

In Sampson v. Sissel, 151 Neb. 521, 38 N. W. 2d 341, following Kellner v. Whaley, *supra,* this court held: "The possession of a deed or other instrument of conveyance by a grantee raises a presumption that the instrument was properly delivered and the burden of proof is upon him who disputes it to overcome the presumption."

In the light of the foregoing discussion, we conclude that there was a delivery of the deed involved.

In the light of grantor's intent, clearly manifested by both acts and words combined, the mere fact that grantor went out to the farm from time to time after execution and delivery of the deed, thereafter collected a portion of his share of the rents, and had some soil conservation work done, would not warrant a finding that there was no delivery. Kellner v. Whaley, *supra;* Colbert v. Miller, *supra.*

Flannery v. Flannery, 99 Neb. 557, 156 N. W. 1065, and Owens v. Reed, 141 Neb. 796, 4 N. W. 2d 914, relied upon by defendants, are distinguishable upon the facts. As disclosed by those opinions, there was no competent

evidence of either acts or words from which it could have been concluded that there was even a manual delivery of the deed much less an intention of the grantor to presently divest himself of title to the property.

We turn then to the question of whether or not the deed was subject to reformation. In that connection, the power of equity to reform instruments and correct mistakes therein in proper cases, is conceded. Without dispute, in the case at bar there was a mistake or error of description made by the scrivener, which did not conform to grantor's express direction and intention. In the light of undisputed evidence, we may assume, for the purpose of argument, that the deed involved was a voluntary conveyance, an executed gift inter vivos, but nevertheless conclude that it was subject to reformation. The rights of subsequent creditors and purchasers for value were not involved, and there was no claim of fraud or undue influence by the grantees.

Courts generally agree that a purely voluntary conveyance may not be reformed in equity at the suit of the grantee against the grantor during his lifetime without his consent. On the other hand, courts are not in agreement upon the question of whether or not such a conveyance is subject to reformation against the heirs at law of the grantor after his death.

Some courts take the view that as a matter of law the grantee's right to reformation is no greater against the heirs at law of the grantor than it would have been as against the grantor in his lifetime. Other courts, however, take the view that the principles precluding reformation of a voluntary conveyance at the suit of the grantee against the grantor during his lifetime do not ordinarily, as a matter of law, apply in favor of the grantor's heirs at law after his death, because when the reason for a rule ceases to exist, so should the rule itself. We adopt the latter view as not only entirely logical, but in the furtherance of justice, for which equity courts exist.

As said in M'Mechan v. Warburton, 1 Ir. R. (1896) 435: "It was contended by the defendant Warburton that, as this was a voluntary deed, this court cannot interfere to rectify it in favour of volunteers. The elementary principle of this Court, that it will not interfere to enforce specific performance of an incomplete voluntary agreement, or to rectify an erroneous voluntary disposition of property in favour of a volunteer, is subject to this exception, that after the death of the donor it will interfere to rectify a disposition which is clearly proved to have, through mistake, failed to carry out the proved intention. The principle is, I think, more correctly stated by confining it to this, that the Court will not rectify a voluntary disposition against the donor. That it will do so in favour of a donor is shown by the case of Lackersteen v. Lackersteen, 30 L. J. Ch. (N. S.) 5, where a voluntary settlement was rectified by Wood, V.-C., at the instance of the settlor. This explains the view taken by Romilly, M. R., in Lister v. Hodgson, L. R. 4 Eq. 34, where he stated the exception I have mentioned in case of a deceased donor, that upon clear proof of the intention of the donor, which, by a mistake, was not correctly carried out by the instrument of gift according to such intention, this Court will interfere to correct the mistake, and thus act in favour of the intention. If the donor were living it would have, of course, been competent for him to consent to such rectification, or to dissent from it. If the latter, it could not be reformed against his will, for a volunteer must take the gift as he finds it; but after his death, and in absence of proof of any change of intention, it cannot be assumed that he would have dissented, and it might even be presumed that he would not dissent." See, also, O'Connor v. McCabe, 42 S. D. 506, 176 N. W. 43; Spencer v. Spencer, 115 Miss. 71, 75 So. 770.

Likewise, in Laundreville v. Mero, 86 Mont. 43, 281 P. 749, 69 A. L. R. 416, it was said: "The supreme court of South Carolina refused to adhere to the doctrine that a voluntary conveyance may not be reformed as against

the heirs of the grantor, in the case of Lawrence v. Clark, 115 S. C. 67, 104 S. E. 330, 334. In that case Mr. Justice Fraser, speaking for the court, said: 'We know there are decisions in other jurisdictions that hold that a voluntary deed cannot be reformed at the demand of the grantee over the objection of the grantor, and that the right of the grantor extends to his heirs at law. The authorities are not binding, and we will not follow them, because the reason of the rule does not extend to the heirs at law. The agreement, being without consideration, could not be enforced against the grantor. It was purely a matter of grace on his part. The grantee paid nothing, and it came with bad grace from him to attempt to force a mere courtesy. The grantor was under no obligation to give what is contained in his deed, and he cannot be required to alter the terms of the gift. The heir at law has given nothing. It never was his. The grantee does not even owe him thanks. When a court orders the reformation of a deed, the reformed deed necessarily speaks as of the date of its original execution. Equity says that the reformed deed is to be considered as the true deed, subject, of course, to the rights of subsequent creditors and purchasers for value, who may have been misled to their injury. When that is done, the heir at law has nothing to relinquish, and never had. No injustice is done to the heir at law.'

"That relief by reformation is proper as against the heirs of the donor is also implied in the decision in the case of Gibson v. Johnson, 148 Ark. 569, 230 S. W. 578.

" 'When the reason of a rule ceases, so should the rule itself.' (Sec. 8739, Rev. Codes 1921.)

"The reason for the rule preventing a court of equity from reforming voluntary conveyances as against the grantor does not extend to the heirs, and we decline to extend the rule in their favor. Each case must be governed by its own facts and circumstances. If there is equity in plaintiff's case as against the rights asserted by the defendants, a reformation should be decreed. If

plaintiff's case is lacking in the elements that go to move the conscience of a court of equity, relief should be denied on that ground, but not for want of jurisdiction in the court because of the voluntary character of the conveyance.

"Here the conveyance was fully executed; the plaintiff retained possession of the property and made some improvements thereon; the defendants have in no way been injured; according to the record they have received everything that the father intended they should have; no rights of innocent third parties have intervened. Under the record here presented, the father would doubtless have desired to make the correction sought by this action, had he learned of the mistake in his lifetime. Under the facts of this case, a court of equity should in furtherance of justice grant relief by reformation." See, also, Mason v. Moulden, 58 Ind. 1.

The statements aforesaid reflect the proper rule, and the basis for its application in this jurisdiction. The last paragraph heretofore quoted could as well be paraphrased to fit the case at bar, except with relation to improvements, which, as shown by the record, were evidently placed on the property by the grantor for the grantees, and the deed was doubtless given to compensate plaintiffs for their continued loyalty and assistance.

Under the undisputed facts and circumstances presented here, a court of equity should, in furtherance of justice, grant relief by reformation as prayed by plaintiffs. The trial court was right, and for the reasons heretofore stated, we conclude that the judgment should be and hereby is affirmed.

AFFIRMED.