**Nick ELL, Plaintiff and Appellee,**

v.

**Adam ELL and Irene Ell, Defendants and Appellants.**

Civ. No. 9772.

Supreme Court of North Dakota.

July 17, 1980.

Rehearing Denied Aug. 12, 1980.

Maurice R. Hunke, Dickinson, and Marshall T. Bergerud, Killdeer, for plaintiff and appellee; argued by Marshall T. Bergerud, Killdeer.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendants and appellants; argued by Ward M. Kirby, Dickinson.

ERICKSTAD, Chief Justice.

This is an appeal from a judgment entered in Dunn County District Court which granted the plaintiff's application for revision and reformation of a written contract. We affirm.

The plaintiff, Nick Ell (Nick), and the defendant, Adam Ell (Adam), are brothers who reside on separate farmsteads in Dunn County, North Dakota. Nick and Adam are the sons of Adolph and Frances Ell, both of whom are now deceased. During their childhood, Nick and Adam lived on a farm which consisted of approximately 480 acres and which included a parcel described as the

"Southwest Quarter (SW¼) of Section Thirty-three (33), Township One Hundred Forty-five (145) North, Range Ninety-six (96) West of the Fifth Principal Meridian, Dunn County, North Dakota" [hereinafter referred to as the Ell quarter]. This action concerns title to one-half of the mineral rights to the land described above.

The trial court's findings of fact are not in dispute. On April 2, 1962, Nick purchased the Ell quarter, as well as an additional 320 acres of the family farmstead, from his parents on a contract for deed. Nick and Adam farmed the land together and engaged in a cooperative farming arrangement on various other lands they owned and leased. The record reveals that there was a 240-acre parcel of land located near the Ell quarter which was commonly referred to as the "Jepson land." It is undisputed that the Ell family had long desired to acquire this tract of land. It was undeniably understood among the Ell family members that if the Jepson land ever became available for purchase, Nick was to acquire the property and transfer the 160-acre tract of land known as the Ell quarter to Adam.

The Jepson land eventually became available for sale in 1963. Nick purchased the 240-acre tract on a contract for deed dated October 24, 1963. The purchase price was $13,200. All mineral rights to the Jepson land were reserved by the seller.

The record reveals that shortly after Nick acquired the Jepson land, he and Adam met relative to the purchase of said property and the forthcoming transfer of the Ell quarter to Adam. The following colloquy between Nick and his attorney on direct examination discloses what took place at that meeting:

"Q. After you purchased the Jepson property, in 1963, did you then discuss with Adam or did you discuss with Adam such purchase?

"A. Yes.

"Q. And where did this discussion take place?

"A. I suppose it was at home.

"Q. At your home where your mother and yourself lived?

"A. Yes.

"Q. Did you advise him of the fact that you had made the purchase?

"A. Yes.

"Q. Was there anything else said by yourself to Adam at such time?

"A. Well, all I said was I was going to reserve the minerals because I didn't get any from the Jepson land.

"Q. You said that you had not received minerals on the Jepson property?

"A. That's right.

"Q. And that you were going to reserve the minerals on the southwest quarter of Section 33 [the Ell quarter]?

"A. Yes.

"Q. Did he indicate any agreement or disagreement with such arrangement?

"A. Well, he didn't say either way.

"Q. He didn't say yes or he didn't say no?

"A. No.

"Q. No argument took place?

"A. No.

"Q. Did you discuss the financial arrangements insofar as the payment of the Jepson property was concerned?

"A. Yes.

"Q. What was the arrangement as to such payment?

"A. Well, he was to pay half of the payments and that then I would give him that quarter of land.

"Q. He was to pay half of the purchase price on the Jepson property?

"A. Yes."

Adam's testimony is in accord with Nick's testimony with respect to the discussion which took place after Nick had purchased the Jepson land.

J. Kenneth Eckes, an attorney from Killdeer, North Dakota, who is now deceased, had been the Ell family's attorney for several years. Nick testified that he approached Eckes sometime around 1963 and asked him to draft a contract for deed for the conveyance of the Ell quarter to Adam. Nick stated that he told Eckes to include a

reservation of mineral rights in the deed. Eckes thereafter prepared a contract for deed which was signed by Nick, Adam, and Irene Ell, Adam's wife, on October 21, 1964. Irene had no knowledge of any prior agreement between the two brothers. The contract for deed called for a conveyance of the Ell quarter to Adam and Irene for the sum of $6,600. It is undisputed that neither the contract for deed nor the quit claim deed which conveyed the Ell quarter to Adam and Irene contained a reservation of the mineral rights in Nick.

On October 21, 1971, Frances Ell executed a warranty deed conveying approximately 480 acres (including the so-called Ell quarter) to Nick pursuant to the 1962 contract for deed between Frances and Adolph Ell (his parents) and himself. On October 21, Nick and Frances Ell (Adolph having died since execution of the contract for deed) also executed a quit claim deed to Adam and Irene Ell which conveyed the Ell quarter to them as "joint tenants and not as tenants in common with the right of survivorship." The quit claim deed, which was also prepared by Eckes, was recorded in the office of the Dunn County Register of Deeds on October 22, 1971. Although Nick testified that he had told Eckes to include a mineral reservation in the quit claim deed, it is undisputed that no such reservation was contained in the instrument.

On September 12, 1972, Nick executed and delivered an oil and gas lease to one C. E. Beck which covered the lands owned by Nick as well as the Ell quarter. This lease was later assigned to Amoco Production Company. Nick received a bonus consideration for execution of the lease and had continued to receive annual delay rental payments for each of the years of the existing ten-year primary term of the lease.

On September 19, 1972, Adam and Irene Ell had executed and delivered an oil and gas lease to Patrick Petroleum Company which covered the lands they owned in Dunn County. The following colloquy between Nick's attorney and Adam is revelatory of Adam's intent with respect to the mineral rights to the Ell quarter:

"MR. HUNKE:

"Q. Now, at the time that you and your wife signed that oil and gas lease [to Patrick Petroleum Company] which is now Plaintiff's Exhibit I, um, you intended to lease all of the minerals that you owned in Dunn County, North Dakota, didn't you?

"A. Yes.

"Q. And at that time, you did not lease the minerals under the southwest quarter of Section 33 [the Ell quarter] because you thought that Nick owned them and you did not, is that also true?

"A. Yes.

"Q. At the time you and your wife signed that oil and gas lease, in September of 1972, and, when you intended to lease all the minerals you owned, if you had known or thought that you owned the minerals under the southwest quarter of Section 33, you would have leased them also, wouldn't you?

"A. Well, I just didn't pay no attention at that time.

"Q. I know that, but, because you thought Nick owned them, right? .

"A. Yes.

"Q. But, if you had known or thought that you had owned the minerals under the southwest quarter of 33, in September of 1972, you would have leased them to the same oil company that you gave the lease on your other land in Dunn County?

"A. Well, yes."

A careful examination of the record reveals that in 1978 Nick and Adam became aware of the absence of a mineral reservation in the quit claim deed of 1971.

In March of 1978, Earle R. Foster, Jr., an independent title examiner and lease broker, was employed by Amoco Production Company to examine titles to oil and gas leases which Amoco held in Dunn County. The purpose was to determine whether or not those titles and leases were in order. Foster's title examinations disclosed that, although Nick had leased the mineral rights to the Ell quarter to C. E. Beck in Septem-

ber of 1972 (the lease was later assigned to Amoco), Nick was not the record title owner to said property. The title examination showed that one-half of the mineral rights to the Ell quarter were vested in Adam, whereas the remaining one-half undivided interest belonged to the State of North Dakota.

After he discovered this discrepancy in the records, Foster paid a visit to the farmstead of Adam and Irene Ell for the purpose of attempting to secure a lease on their one-half interest in the minerals in the Ell quarter. Foster informed Adam that he (Adam) was the record title owner to one-half of the minerals, and Foster offered Adam $30 per net mineral acre as a bonus from Amoco for acquisition of an oil and gas lease on the Ell quarter. The events which took place at that first visit, and subsequent visits to the Ell farmstead by Foster, are best revealed in the following colloquy at trial between Adam and opposing counsel:

*"MR. HUNKE:*

"Q. He [Foster] came to you three times then and the first time he just came to you and talked about maybe whether he could get a lease from you and he explained to you that the records showed that even though Nick had given an oil and gas lease on the southwest quarter of 33 [the Ell quarter], the records showed that Nick didn't own the minerals, but, that you did. Do you recall that he just told you about that?

"A. Yes.

"Q. And of course, you were surprised to learn that, isn't that right?

"A. Yes.

"Q. And in fact, you didn't believe it when Mr. Foster told you that, so, he said, well, I'll come back again and I'll bring a copy of the deed and show it to you. Do you remember that?

"A. Yes.

"Q. And then Mr. Foster came back a second time, a few days later, and he had with him a photocopy of the quit claim deed and he showed it to you that it didn't reserve the minerals to Nick? Do you recall that?

"A. Yes.

"Q. And again, you were very surprised to know that, weren't you?

"A. Yes.

"Q. And the first time that Mr. Foster came to you, you said that you didn't believe that and that is why he went to get the deed, isn't that right?

"A. Yes.

"Q. And you believed that the records showed that you didn't own the minerals because you thought that Nick had reserved them and there was a reservation in the contract for deed and the quit claim deed from Nick to you?

"A. Yes.

"Q. In fact, after Mr. Foster showed you the deed to convince you, then later on, you yourself, went into the Register of Deeds office with your wife, didn't you?

"A. Yes.

"Q. And you looked over the records again?

"A. Yes.

"Q. Because you still couldn't believe that you owned the minerals? You still thought that Nick did?

"A. Yes.

"Q. Now, I want to go back to one more thing, that I may not have covered. When you granted your oil and gas lease on September 19, 1972, um, and when you intended to lease all the minerals that you owned in Dunn County, um, you knew that the southwest quarter of 33 was not included in that lease, didn't you?

"A. Yes.

"Q. Again, because at that time, you thought Nick owned the minerals under the southwest quarter of 33?

"A. Yes."

Subsequent to his second visitation with Adam, Foster also met with Nick and explained to Nick what a title examination of the Ell quarter had disclosed, namely, that Adam was the record title owner to one-half of the minerals in the Ell quarter. Foster testified that Nick expressed the

opinion that he (Nick) owned the minerals and not Adam. Thereafter, Nick approached Adam to determine whether or not Adam would be willing to remedy the discrepancy and convey to him the minerals. The evidence shows that Adam refused to sign any such document. No further discussion took place between the parties.

On July 31, 1978, Nick commenced an action for reformation of the quit claim deed of October 21, 1971, "to conform to the actual agreement of the parties." Trial was held in Dunn County District Court on November 30, 1979. On January 9, 1980, the district court issued its findings of fact, conclusions of law, and order for judgment. In addition to the relevant facts previously set forth in this opinion, we quote the following from the trial court's findings of fact:

"13. That the Court finds as a matter of fact, upon evidence which is clear, convincing, persuasive and compelling, that at the time Exhibit C (the contract for deed described in paragraph 11 above) and Exhibit E (the quit claim deed described in paragraph 12 above) were executed and delivered, both Nick and Adam knew, intended, understood and agreed that the minerals would be and were reserved to Nick solely and separately and that it was only because of a mutual mistake that such instruments (Exhibits C and E) did not include an appropriate reservation of minerals to Nick. . . .

\* \* \* \* \* \*

"(c) On at least two occasions subsequent to recording of the quit claim deed (Exhibit E) described in paragraph 12 above, third parties approached Adam for the purpose of leasing the minerals under the land described in paragraph 2 above, but Adam responded to such third parties with words to the effect that he did not own the minerals under such land but that his brother Nick owned such minerals.

\* \* \* \* \* \*

"(f) Neither Nick nor Adam knew that Exhibit E mistakenly failed to reserve the minerals to Nick and neither brother learned of such mistake until March of 1978. Both brothers were surprised to learn of the mistake.

"(g) Both Nick and Adam first learned that the quit claim deed (Exhibit E) did not include a reservation of minerals to Nick in March of 1978 when a person by the name of Earle R. Foster, Jr., who had been employed by Amoco Production Company to examine the title to oil and gas leases which Amoco held in Dunn County to see that the titles and leases were correctly coordinated, informed both Nick and Adam that although Nick had leased the oil and gas under the land described in paragraph 2 above, he was not the record title owner, but instead the Dunn County records revealed that Adam was the record title owner. Mr. Foster went to the farm of Adam on three separate occasions to inform him of such fact and on the first occasion Adam was so surprised to learn that the record title to the minerals was in his name that he would not believe Mr. Foster. Mr. Foster informed Adam that he would obtain a photocopy of the quite claim deed (Exhibit E) and return to show it to Adam. Mr. Foster did so. When Mr. Foster first informed Adam of the discrepancy, with Adam's wife Irene present, Adam stated words to the effect that he guessed that 'Nick was supposed to have owned those minerals.'

\* \* \* \* \* \*

"(i) That at all times from the date of execution of Exhibits C and E, Adam knew, believed and understood that Nick had reserved the minerals under the land described in paragraph 2 above and he knew that the reservation of minerals to Nick should have been placed in such instrument and he knew that it was a mistake on the part of somebody to leave out such reservation. At all times pertinent hereto Adam believed and understood that Nick owned the minerals under the land described in paragraph 2 above [the Ell quarter] and he believed and understood such until Mr. Foster informed him of the mistake in March of 1978.

"14. That the evidence which establishes the facts found in the sub-paragraphs of paragraph 13 and in paragraphs 9 through 12 above is undisputed, uncontradicted, and unimpeached and by reason of such facts, neither Nick nor Adam had any reason to suspect that Exhibits C and E did not include a reservation of the minerals to Nick and under the circumstances Nick could not have learned of the mistake and lack of such minerals reservation by the exercise of reasonable diligence."

Thereafter, and pursuant to the provisions of Chapter 32–04 of the North Dakota Century Code, Adam and Irene Ell were ordered to execute and deliver to Nick an appropriate document conveying the mineral rights to the Ell quarter. Judgment was entered on January 10, 1980, from which an appeal has been taken to this court.

The first issue raised on appeal concerns the application of the statute of frauds and the parol evidence rule to actions for the reformation of a written instrument. The defendant-appellants, Adam and Irene Ell, contend that parol evidence as to prior oral agreements concerning a mineral reservation in the quit claim deed of October 21, 1971, is inadmissible. They assert that "the absence of any alleged mineral reservation is conclusive." We disagree.

Section 9–06–04 of the North Dakota Century Code provides in pertinent part as follows:

"9–06–04. *Contracts invalid unless in writing—Statute of Frauds.*—The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

   *    *    *    *    *    *

"4. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing subscribed by the party sought to be charged."

A quit claim deed which conveys an interest in real property falls under the provisions of this section.

The parol evidence rule is not a rule of evidence, but rather, it is a rule of substantive law. *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D.1974); *Northwestern Equipment v. Tentis*, 74 N.W.2d 832 (N.D. 1956); *Allgood v. National Life Ins. Co.*, 61 N.D. 763, 240 N.W. 874 (1932). The parol evidence rule is codified, in part, in section 9–06–07 of the North Dakota Century Code. *Hanes v. Mitchell*, 78 N.D. 341, 49 N.W.2d 606 (1951).

Section 9–06–07 provides that a written contract supersedes all prior or contemporaneous oral agreements or conditions concerning the subject matter of the contract, even though the contract is not required to be in writing. *Rieger v. Rieger*, 175 N.W.2d 563 (N.D.1970); *Jensen v. Siegfried*, 66 N.D. 222, 263 N.W. 715 (1935). Nevertheless, it is well-established that parol evidence is admissible in a suit to reform a written instrument on the grounds of fraud or mutual mistake of the parties. Parol evidence is admissible not only to establish the alleged fraud or mistake, but also to correct the instrument to conform to the agreement or intention of the parties. *Oliver-Mercer Electric Cooperative, Inc. v. Fisher*, 146 N.W.2d 346 (N.D.1966); *Cokins v. Frandsen*, 141 N.W.2d 796 (N.D.1966); *Ives v. Hanson*, 66 N.W.2d 802 (N.D.1954); *L.W. Wentzel Implement Co. v. State Finance Co.*, 63 N.W.2d 525 (N.D.1954); *Forester v. Van Auken*, 12 N.D. 175, 96 N.W. 301 (1903); 66 Am.Jur.2d *Reformation of Instruments* § 118 (1973); 76 C.J.S. *Reformation of Instruments* § 83 (1952); 3 A. Corbin, Contracts §§ 540, 580 (1960 & Supp. 1971); 13 Williston on Contracts § 1552 (1970); see Sections 32–04–17 and 32–04–19, N.D.C.C. Thus, reformation is a limitation on the parol evidence rule which is necessary to reach a just result. Any evidence which tends to show the true intention of the parties, whether it be evidence of conduct or declarations of the parties extrinsic to the contract or documentary evidence, is admissible.

We conclude, as did the trial court, that parol evidence is admissible in an action for reformation of a contract to establish fraud or mutual mistake as well as to show the true intention of the parties. To hold otherwise would render the parol evidence rule an instrument of the very fraud or mistake it was designed to prevent. In the absence of such a salutary exception to the parol evidence rule, it would be virtually impossible to establish the grounds relied on for reformation. *Blackman v. Folsom*, 200 N.W.2d 542 (Iowa 1972).

We have recognized that equity will grant remedial relief in the nature of reformation of a written instrument, resulting from a mutual mistake, when justice and conscience so dictate. *Cokins v. Frandsen*, 141 N.W.2d at 799; *Wilson v. Polsfut*, 78 N.D. 204, 49 N.W.2d 102 (1951). However, in actions for reformation, a presumption arises from the terms of the instrument that it correctly expresses the true agreement and intention of the parties. *Ives v. Hanson*, 66 N.W.2d at 805. Courts will not make a new contract through reformation of a written instrument in a manner never considered or intended by the parties. *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D.1979).

Section 32–04–17, N.D.C.C., is the pertinent statutory provision which provides for the equitable remedy of reformation:

"32–04–17. *Revision of contract for fraud or mistake.*—When, through fraud or mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention so far as it can be done without prejudice to rights acquired by third persons in good faith and for value."

The burden of proof rests on the party who seeks reformation to prove that the written instrument does not fully or truly state the agreement that the parties intended to make. *Oliver-Mercer Electric Cooperative,*

*Inc. v. Fisher*, 146 N.W.2d at 356; *Ives v. Hanson*, 66 N.W.2d at 805–06. Further, we said in *Oliver-Mercer Electric Cooperative, Inc. v. Fisher*, 146 N.W.2d at 355–56:

"[P]arol evidence of an alleged mutual mistake as a basis for the modification of a written instrument must be clear, satisfactory, specific and convincing, and a court of equity will not grant the high remedy of reformation even upon a mere preponderance of the evidence, but only upon the certainty of error. *Ives v. Hanson*, N.D., 66 N.W.2d 802; *Wilson v. Polsfut*, 78 N.D. 204, 49 N.W.2d 102; *Metzler v. Bolen*, D.C., 137 F.Supp. 457; *Wheeler v. Boyer Fire Apparatus Co.*, 63 N.D. 403, 248 N.W. 521."

Each case involving the reformation of a contract on grounds of fraud or mutual mistake must be determined upon its own particular facts and circumstances. In considering whether or not a mutual mistake exists, the court can properly look into the surrounding circumstances and take into consideration *all* facts which disclose the intention of the parties. *Akers v. Sinclair*, 37 Wash.2d 693, 226 P.2d 225 (1951); 66 Am.Jur.2d *Reformation of Instruments* § 118 (1973); 76 C.J.S. *Reformation of Instruments* § 28 (1952).

In the case at bar, the trial court found that at the time the Ell quarter was conveyed to Adam and Irene Ell pursuant to the contract for deed dated October 21, 1964, and the subsequently-executed quit claim deed of October 21, 1971, "both Nick and Adam knew, intended, understood and agreed that the minerals would be and were reserved to Nick solely and separately and that it was only because of a mutual mistake that such instruments . . . did not include an appropriate reservation of minerals to Nick . . . ." The trial court then proceeded in its findings of fact to specifically list those factual events and circumstances which evidenced the existence of a mutual mistake justifying reformation of the deed. Those circumstances disclose a mistake of fact as defined by

Section 9–03–13, N.D.C.C.[1] Counsel for the appellants has not asserted on appeal that the trial court's findings of fact are clearly erroneous pursuant to Rule 52(a), N.D.R. Civ.P., and he conceded at oral argument that the court's factual findings are undisputed.

Counsel for Adam and Irene has contended in essence that the evidence of mistake on the part of Adam cannot be clear and convincing when the evidence is that Adam remained silent when Nick told Adam that he intended to reserve the minerals in the Ell quarter. That silence, when one may be expected to speak if he disagrees, can be significant is indicated by our decision in *Hutton v. Korynta*, 218 N.W.2d 177 (N.D. 1974).

We conclude that the evidence of a mutual mistake which was presented at trial and which we have discussed herein warrants reformation of the written instrument, the evidence being clear, satisfactory, specific and convincing. We believe that all of the facts and circumstances relating to the conduct of the parties with reference to the land lead to the inescapable conclusion that the true intention of the parties was that Nick retain the mineral rights in the Ell quarter and that all parties concerned were of the opinion that he had done just that. Thus, we believe that reformation is a proper remedy in this case to conform the deed to reflect the true intention of the parties.

The second issue raised on appeal is whether or not the reformation action is barred by the statute of limitations. Counsel for the appellants contends that the cause of action for reformation accrued in 1964 when the contract for deed was executed by the parties. He asserts that because the reformation action was not commenced until July of 1978, the action is barred by either the six-year limitation period of Section 28–01–16, N.D.C.C.[2] or the ten-year limitation period enunciated in Section 28–01–15, N.D.C.C.,[3] whichever period is deemed applicable.

Regardless of which limitation period applies to actions for the reformation of a written instrument on the ground of mutual mistake, we follow the weight of authority and hold that a reformation action accrues, or comes into existence as a legally enforceable right, not at the time the instrument in question is executed, but at the time the facts which constitute the mistake and form the basis for reformation have been, or in the exercise of reasonable diligence should have been, discovered by the party applying for relief. *See* 66 Am. Jur.2d *Reformation of Instruments* § 91 (1973); 76 C.J.S. *Reformation of Instruments* § 69 (1952 & Supp. 1980); Annot., 106 A.L.R. 1338 (1937), and the cases cited therein; *see also* Section 28–01–16(6), N.D. C.C. (six-year limitation period in actions for relief on the ground of fraud-action accrues at time of discovery of facts which constitute the fraud); 54 Am.Jur.2d *Mistake, Accident, or Surprise* § 24 (1971). This is analogous to our holding in *Iverson v. Lancaster*, 158 N.W.2d 507, 510 (N.D.

---

1. "9–03–13. *'Mistake of fact' defined.*—Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:
   1. An unconscious ignorance or forgetfulness of a fact, past or present, material to the contract; or
   2. Belief in the present existence of a thing material to the contract which does not exist, or in the past existence of such a thing which has not existed." § 9–03–13, N.D.C.C.

2. "28–01–16. *Actions having six-year limitations.* The following actions must be commenced within six years after the cause of action has accrued:
   1. An action upon a contract, obligation, or liability, express or implied, subject to the provisions of sections 28–01–15 and 41–02–104." § 28–01–16(1), N.D.C.C.

3. "28–01–15. *Actions having ten years limitations.*—The following actions must be commenced within ten years after the cause of action has accrued:
   \* \* \* \* \* \*
   2. An action upon a contract contained in any conveyance or mortgage of or instrument affecting the title to real property except a covenant of warranty, an action upon which must be commenced within ten years after the final decision against the title of the covenantor; . . . ." § 28–01–15(2), N.D. C.C.

1968), wherein we held that the limitation period commences to run against a malpractice action from the time the act of malpractice with resulting injury is, or by reasonable diligence could be, discovered. The record clearly shows that neither party discovered the mistake, nor for all practical purposes should have discovered the mistake by the exercise of reasonable diligence, until March of 1978. Therefore, regardless of which limitation period applies, the action for reformation filed in July of 1978 was timely.

Finally, the contention that the remedy of reformation is not available as against Irene Ell is without merit. The appellants contend that Irene Ell had no notice of the alleged oral agreement between Nick and Adam and that reformation of the deed would be prejudicial to her interests. With respect to Irene Ell, the trial court made the following relevant findings which are uncontroverted:

"15. That the separate Defendant Irene Ell did not at any time prior to March of 1978 participate in any discussions or negotiations with the Plaintiff Nick Ell with regard to acquisition of the land described in paragraph 2 above [the Ell quarter] and had no specific knowledge of the terms the agreement reached between Nick and Adam.

"16. That Irene Ell accepted whatever agreement it was that her husband Adam had reached with Nick and her name was placed on Exhibits C and E [the contract for deed of October 21, 1964, and the quit claim deed of October 24, 1971] as a grantee solely for the purpose of facilitating placing ownership of the property in joint tenancy with right of survivorship between Adam Ell and Irene Ell as husband and wife without any prior consideration having been paid by Irene Ell and her interest in the property was only in the nature of a voluntary grant to her and at all times pertinent hereto Irene Ell was in the position of a voluntary grantee.

"17. That at no time prior to March of 1978 did Irene Ell know, believe or claim that she owned any interest whatsoever

in the minerals underlying the land described in paragraph 2 above and as factually found in paragraph 13(b) hereinabove, at the time Irene executed the Oil and Gas Lease therein described [to Patrick Petroleum Company] she intended and thought that she had granted an Oil and Gas Lease covering all of the minerals in which she or her husband owned any interest located in Dunn County, North Dakota, but that such Oil and Gas Lease did not cover any of the minerals under the land described in paragraph 2 above [the Ell quarter]."

As previously indicated, the record reveals that, although doubtfully enforceable at law, there was a longstanding agreement among the Ell family members that if the Jepson land ever became available for purchase, Nick was to acquire the 240-acre parcel of land and transfer the Ell quarter to Adam. When the Jepson land became available for sale in 1963, Nick purchased the property, and, thereafter, met with Adam to discuss the transfer of the Ell quarter to him and a reservation of the minerals on the land. It is undisputed that Irene took no part in the negotiations concerning the purchase and transfer of the Ell quarter. The following conversation between Nick's attorney and Irene is indicative of her role in the transaction:

"Q. And at the time you signed the contract for deed then on the southwest quarter of 33, that is now Plaintiff's Exhibit C, which I'm handing you, you signed that merely so that the title to the property would go to you and your husband in joint tenancy—

"MR. KIRBY: I am going to object as improper examination, invading the province of the Court and calling for a legal conclusion as to what she signed.

"THE COURT: Well, overruled. I think she can answer what you thought you signed at the time and what it meant to you. You can answer that.

"A. Well, I was told it was about some land and I was told to sign it. "QUESTIONS BY:

*"MR. HUNKE:*

"Q. Did you know why you were suppose to sign it?

"A. No.

"Q. And—

"A. That we bought some land.

"Q. And you merely signed it because Adam asked you to?

"A. That's true.

"Q. But, you had no idea what the agreement was underlining?

"A. No.

"Q. And you, as far as you knew, you were accepting whatever agreement Adam and Nick had reached?

"A. I don't know how I could have. I didn't know.

"Q. Yes. You didn't know what it was and at the time you didn't care. You were just trusting your husband and Adam and Nick had it worked out and then Adam said come sign the papers now, is that about what happened?

"A. I guess so."

The following colloquy between Nick's attorney and Adam further discloses Irene's involvement and purpose in the land transfer:

"Q. Now, did you ever tell your wife before the contract for deed was signed that Nick had said that he was going to reserve the minerals?

"A. No.

"Q. Apparently your wife really didn't know anything about the agreement, is that true?

"A. That's true.

"Q. And your wife, your wife Irene's name was put on the contract merely to allow you and your wife to own it in joint tenancy, with the right of survivorship?

"A. Yes.

"Q. And that was a plan that you and your wife had?

"A. Yes.

"Q. But, actually, your wife did not participate in the discussion and she just accepted the agreement that you made with Nick?

"A. Yes.

"Q. So, whatever agreement you made with Nick, you felt that your wife signed the contract with that understanding?

"A. Yes."

The reformation of a written instrument is an equitable remedy predicated upon the equitable maxim that equity treats that as done which ought to have been done. *See Foster v. Richey*, 192 Ark. 683, 93 S.W.2d 1258 (1936). The general rule is that reformation will be allowed as against the original parties to the instrument and all those who claim under said parties in privity, with the exception of bona fide purchasers or encumbrancers for value and without notice. Annot., 79 A.L. R.2d 1180 (1961 & Later Case Service); Annot., 44 A.L.R. 78 (1926); 66 Am.Jur.2d *Reformation of Instruments* § 63 (1973); 76 C.J.S. *Reformation of Instruments* §§ 54–65 (1952 & Supp. 1980). In the instant case, the record clearly shows that Irene Ell stands in the equitable position of a donee-beneficiary of the Ell family agreement pursuant to which her husband, Adam, would receive the Ell quarter in the event the Jepson land became available for purchase. The record further discloses that, until March of 1978, Irene Ell neither knew, believed, nor ever claimed that she retained any ownership interest in the minerals underlying the Ell quarter, and therefore would not be prejudiced by reformation of the deed. To hold that reformation is not available as against Irene Ell would render the remedy useless and ineffective under the circumstances. The general principles of equity warrant and justify reformation of the deed as against both grantees under the instrument.

For the reasons stated in this opinion, the judgment of the district court is affirmed.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.