Anton ZABOLOTNY and Bernel Zabolotny, Plaintiffs and Appellees,

v.

Steve FEDORENKO, also known as Stephen Fedorenko, the unknown heirs at law, devisees, legatees, and creditors of Stephen Fedorenko, deceased; Vera Fedorenko, the unknown heirs at law, devisees, legatees, and creditors of Vera Fedorenko; Emma Plesuk, the unknown heirs at law, devisees, legatees, and creditors of Emma Plesuk; Ronald W. Plesuk, Sharon K. Klokonos, Peter Plesuk, Sophie Shield, Helen Lushenko, and any other persons unknown claiming any estate in or lien or encumbrance on the property described in the Complaint, Defendants,

Ronald W. Plesuk, Sharon K. Klokonos and Peter Plesuk, Defendants and Appellants.

Civ. No. 10067.

Supreme Court of North Dakota.

Feb. 11, 1982.

Thomas F. Murtha, and Baird Law Firm, Dickinson, for plaintiffs; argued by Murtha; appearance by David F. Senn, Dickinson.

Tuntland Law Office, Garrison, for appellants; argued by Mervin A. Tuntland, Garrison.

ERICKSTAD, Chief Justice.

This is an appeal by the defendants (herein referred to as the Fedorenko heirs) from a judgment of the District Court of Billings County, dated June 11, 1981, reforming a quit claim deed, dated November 22, 1948, between Stephen Fedorenko, as grantor, and Anton Zabolotny, as grantee, to include the following property (herein referred to as the Southeast Quarter):

"The Southeast Quarter (SE¼) of Section Four (4), in Township One Hundred Forty-four (144) North, of Range Ninety-eight (98) West of the Fifth Principal Meridian, Billings County, North Dakota."

On appeal the Fedorenko heirs, asserting that the district court erred in granting a reformation of the deed to include the Southeast Quarter, raise two issues:

(1) Whether or not the court's finding that there was a mutual mistake between the parties to the deed is clearly erroneous; and

(2) Whether or not the court's finding that Anton gave consideration for the conveyance, thereby permitting reformation, is clearly erroneous.

Katie Zabolotny Fedorenko's first marriage was to Alex Zabolotny. As a result of the marriage they had four children: Anton, Anna, Lena, and Margaret. Upon Alex's death, Katie received from his estate a one-third undivided interest in 360 acres of farmland located in Billings County including the Southeast Quarter. The remaining undivided two-thirds interest in the 360 acres was distributed from Alex's estate to the four children. Thereafter Katie married Stephen who, at the time of their marriage, had three children from a previous marriage.

Katie died intestate during 1948, and Stephen received from her estate an undivided one-third interest in the undivided one-third interest of farmland she had inherited from Alex. The remaining two-thirds undivided interest of Katie's one-third undivided interest was distributed equally among the four children of her marriage to Alex.

The attorney for Katie's estate prepared two deeds which he sent to Stephen with a cover letter stating in relevant part:

"Katie Zabolotny Fedorenko died November 11, 1948, as you know, and she owned an undivided one-third interest in certain property in Billings County, about 360 acres. We understand that you do not claim any part of the land and want to give it to the children.

"You can either deed it to the children or if you wish you can deed it to Anton Zabolotny and he can pay off the remaining children."

Stephen signed the quit claim deed in controversy and returned it, by mail, to the attorney for Katie's estate with a cover letter stating:

"I decide with the girls that we deed that share to Anton Zabolotny. And he can pay the remaining to Lena & Margaret Zabolotny."

Subsequent to Stephen's death, Anton discovered that the quit claim deed did not include the Southeast Quarter. He then filed a quiet title action which he subsequently amended to request a reformation of the quit claim deed to include the Southeast Quarter.

A trial was held before the district court without a jury on January 30, 1981. The court concluded that the parties to the conveyance had intended to include the Southeast Quarter but that, through mutual mistake, it had been inadvertently excluded from the quit claim deed:

"X.

"That the Court finds as a matter of fact, upon evidence which is clear, convincing, persuasive and compelling, that at the time Defendant's Exhibit No. 4 (the Quit Claim deed signed by Steve Fedorenko) was executed and delivered, both Steve Fedorenko and Anton Zabolotny knew, intended, understood and agreed that all of Steve Fedorenko's interest in the real property of Katie Zabolotny Fedorenko be conveyed to Anton Zabolotny; and the only reason it was not included was due to a clerical error in the preparation of the Deed. . . ."

The court entered judgment in favor of Anton directing that the quit claim deed be reformed to include the Southeast Quarter, and from that judgment the Fedorenko heirs have filed this appeal.

On appeal the Fedorenko heirs assert that the court erred in its determination that there was a mutual mistake between the parties. We have ascertained that the record includes the following evidence in support of the district court's finding of a mutual mistake:

(1) The attorney for Katie's estate, upon preparing two alternative quit claim deeds for Stephen's signature, sent them to Stephen with a cover letter stating in part, "we understand that you do not claim any part of the land and want to give it to the children." Upon signing one of these deeds, Stephen returned it to the attorney for the estate with a cover letter stating, "I decide with the girls that we deed that share to Anton Zabolotny." In this response Stephen did not express any intention to convey to Anton less than the entire share he (Stephen) inherited from Katie.

(2) The last will and testament executed by Stephen expressly bequeaths to his children by detailed description the real property owned by him, but it does not mention any ownership by Stephen in the Southeast Quarter.

(3) Elizabeth Fedorenko, Stephen's sister-in-law, testified that after Katie's death Stephen said he had conveyed all of Katie's property to the children and that "he didn't want none of that because that was Katie's children's and it belonged to her children."

(4) After Katie's death and to the present time Anton has farmed and paid taxes on the property, including the Southeast Quarter, and Stephen never made any claim to the property. In this regard Anton testified:

"Q. During all that time, um, did Steven Federenko ever make any claim against that property?

"A. No, he never did.

"Q. Did he ever ask you to pay any money for the property?

"A. No, he never did.

"Q. Um, did he ever ask for any of the profits off of it?

"A. No, he never did.

"Q. Did he ever offer to pay any of the taxes on it?

"A. No, he never did.

"Q. Um, did he ever inquire as to how the farm was going and how his interest was getting along or anything of that nature?

"A. No, nothing was said about it.

"Q. Did he ever attempt to run cattle on it or do anything?

"A. No, he never did."

(5) Subsequent to Katie's death there was an agreement between Stephen and Katie's children by her marriage with Alex that Stephen would convey his inherited share of the farmland to Anton without payment, that Stephen would receive all of Katie's personal property, and that Katie's daughters would also convey their inherited share of the farmland to Anton for which they would receive payment from Anton.

(6) Stephen and Katie, upon marrying each other, agreed that neither of them would inherit each other's property but that the property of each would pass to his or her children by a prior marriage. In this regard, Elizabeth Fedorenko, Stephen's sister-in-law, testified:

"Q. Did you know Mrs. Zabolotny whom Steve Federenko married?

"A. Yes, I met her after Steven married her and he came to our farm after they got married and he, um, introduced her to my husband and me and then we started talking and he says, 'Well, we come to tell you something.' He said, Steven said, and he said, 'We have both half children and we both have properties, so we need an agreement and the agreement is this, that if I pass away, all my property is to go to my children and if she passes away, all her property is to go to her children.' "

■■ A court of equity will grant relief by way of reformation of a written instrument, resulting from a mutual mistake, when justice and conscience so dictate. *Co-*

*kins v. Frandsen*, 141 N.W.2d 796 (N.D. 1966). However, the burden of proof rests upon the party seeking reformation to prove that the written instrument does not accurately state what the parties intended with evidence that is clear, satisfactory, specific, and convincing that there was a mutual mistake of fact. *Ives v. Hanson*, 66 N.W.2d 802 (N.D.1954). In *Ell v. Ell*, 295 N.W.2d 143 (N.D.1980), this Court stated:

"Each case involving the reformation of a contract on grounds of fraud or mutual mistake must be determined upon its own particular facts and circumstances. In considering whether or not a mutual mistake exists, the court can properly look into the surrounding circumstances and take into consideration *all* facts which disclose the intention of the parties." 295 N.W.2d at 150.

Upon reviewing the record in this case, we conclude that the district court's finding, that the evidence of mutual mistake was clear, convincing, persuasive, and compelling, was not clearly erroneous. Rule 52(a), N.D.R.Civ.P. We are not convinced that the district court made a mistake in finding clear and convincing evidence that the parties to the quit claim deed intended it to include the Southeast Quarter but that, through mutual mistake, a description of the Southeast Quarter was omitted from the deed.

The Fedorenko heirs also assert that the district court erred in its finding that there was consideration given by Anton to Stephen for the conveyance upon which to support reformation of the deed on behalf of Anton. We conclude that under the circumstances of this case the issue of whether or not consideration was given by Anton for the conveyance is irrelevant to the determination of whether or not the court should have granted reformation.

■■ Generally, a court of equity will not reform a voluntary deed, conveying property without consideration, in favor of the grantee or those holding under him. *I.e., Dunn v. Dunn*, 242 N.C. 234, 87 S.E.2d 308 (1955). The basis for this rule of equity is well stated in *Dunn, supra*:

" . . . ordinarily equity will not reform a purely voluntary conveyance, the general rule with us being that equity will not assume jurisdiction to reform a deed unless it be shown that the transaction was based on a valuable or meritorious consideration. This rule is based on the proposition that in respect to a voluntary conveyance the grantee has no claim on the grantor, and that any mistake or defect is a mere failure in a bounty which the grantor was not bound to make and hence is not required to perfect. Thus, a volunteer must take the gift as he finds it. In short, one who accepts another's bounty ordinarily will not be heard to say something else should have been given." [Citations omitted.] 87 S.E.2d at 311. There is an apparent split of authority, however, as to whether or not the rule against reformation of a voluntary conveyance applies in an action by the grantee as against the heirs of the grantor. Some jurisdictions follow the rule that a voluntary deed cannot be reformed in favor of the grantee against the grantor's heirs. *Harrod v. Simmons*, 143 So.2d 717 (Fla.App. 1962); *Kaylor v. Lewis*, 212 Ark. 785, 208 S.W.2d 185 (1948); *Lyon v. Balthis*, 24 Ohio App. 57, 155 N.E. 815 (1926); *Willey v. Hodge*, 104 Wis. 81, 80 N.W. 75 (1899). Other courts have held that a court of equity is not precluded from reforming a voluntary conveyance on behalf of the grantee against the grantor's heirs providing that the grantor, if living, would not have objected to the reformation requested by the grantee. *Hohneke v. Ferguson*, 196 Neb. 505, 244 N.W.2d 70 (1976); *Dowding v. Dowding*, 152 Neb. 61, 40 N.W.2d 245 (1949); *See also, Laundreville v. Mero*, 86 Mont. 43, 281 P. 749 (1929). We believe the latter is the better reasoned rule, and we choose to follow it.

In *Ell v. Ell*, 295 N.W.2d 143 (N.D.1980), we stated that reformation of a written instrument is an equitable remedy predicated upon the maxim that "equity treats that as done which ought to have been done." By permitting reformation of a voluntary conveyance in favor of the grantee against the grantor's heirs, unless there is evidence to establish that the grantor would have objected to the reformation, a court of equity can do what the parties to the conveyance had intended be done and can thereby accomplish the grantor-donor's intent. Conversely, by not permitting reformation of a voluntary conveyance on behalf of the grantee against the grantor's heirs when the evidence establishes that the grantor, if living, would have objected to the reformation, the grantor-donor's intent is likewise accomplished.

In this case there is no evidence to demonstrate that Stephen, if living, would have objected to reforming the quit claim deed to include the Southeast Quarter. Rather, there is substantial evidence to support the district court's finding that Stephen intended to convey all of his inherited share of Katie's property to Anton and that he thought he had done so by signing the quit claim deed. Consequently, to uphold the reformation of the deed it is unnecessary to determine whether or not Anton gave consideration for the conveyance.

In accordance with the foregoing opinion, we hold that the district court did not err upon reforming the quit claim deed to include the Southeast Quarter, and we affirm its judgment.

VANDE WALLE, PEDERSON, ERICKSON and SAND, JJ., concur.